UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

THE STATE OF GEORGIA; GEORGIA
DEPARTMENT OF COMMUNITY
HEALTH,

PLAINTIFFS,

v.

CHIQUITA BROOKS-LASURE, in her official
capacity as Administrator of the Centers for
Medicare and Medicaid Services; DANIEL
TSAI, in his official capacity as Deputy
Administrator and Director of the Center for
Medicaid and CHIP Services; THE CENTERS
FOR MEDICARE AND MEDICAID
SERVICES; XAVIER BECERRA, in his official
capacity as Secretary of Health and Human
Services; THE UNITED STATES
DEPARTMENT OF HEALTH AND
HUMAN SERVICES; THE UNITED STATES
OF AMERICA,

DEFENDANTS.

CIVIL ACTION NO. _____

**COMPLAINT**

The State of Georgia and Georgia Department of Community Health bring this civil action

against the above-listed Defendants for declaratory and injunctive relief and allege as follows:

**INTRODUCTION**

1.     This case is about whether the federal government can benefit from its own unlawful

conduct. The timeline tells the entire story. In October 2020, Georgia and the Centers for Medicare

and Medicaid Services (CMS) entered into an agreement authorizing Georgia to implement an

innovative 5-year Section 1115 demonstration project called Pathways to Coverage ("Pathways"). In

January 2021, CMS sent Georgia a letter stating that it had "preliminarily determined" that Pathways

was unlawful and should be rescinded. In light of this determination, Georgia reasonably suspended

implementation of Pathways. And it waited. Then, at the end of 2021, CMS finally formally rescinded its approval of core aspects of the Pathways project.

2.     Georgia swiftly brought suit and moved for summary judgment and expedited consideration. Then, in August 2022, this Court set aside CMS' rescission as unlawful, allowing Pathways to commence after being held up for years by CMS' unlawful actions. After its win in court, Georgia sought to implement Pathways for the full 5-year program term that it was promised. CMS, however, was not deterred by this Court's holding and denied Georgia's request to revise Pathways' end date to account for the years Pathways lost due to CMS' unlawful actions.

3.     By denying Georgia's request to reinstate the full five-year period CMS originally approved, CMS has acted illegally and arbitrarily and capriciously. CMS has brazenly sought to hold Georgia responsible for the effects of CMS' own illegal conduct, since but-for CMS' wrongful Rescission, Georgia would have been able to operate Pathways for a full five-year period. Furthermore, CMS' Denial flouts this Court's August 2022 decision, which set aside and vacated CMS' Rescission, restoring the original terms of the parties' agreement.

4.     CMS' flagrant defiance of the law and this Court's previous order unfortunately require judicial intervention once more to vindicate the agreement Georgia entered into over 3 years ago and expended considerable resources in good faith efforts to implement. This Court should again vacate CMS' attempt to renege on its promise and unlawfully rewrite the terms of the program.

## PARTIES

5.     Plaintiff State of Georgia is a sovereign State of the United States of America.

6.     Plaintiff Georgia Department of Community Health is an administrative agency organized under the laws of Georgia. It is the State agency designated under 42 C.F.R. §431.10 to administer Georgia's Medicaid program and demonstration projects related to that program.[1]

---

[1] For ease of reference, Plaintiffs will be referred to collectively as "Georgia."

7.     Defendant Chiquita Brooks-LaSure, sued in her official capacity, is the Administrator of the Centers for Medicare and Medicaid Services.

8.     Defendant Daniel Tsai, sued in his official capacity, is the Deputy Administrator and Director of the Center for Medicaid and CHIP Services. He signed the October 5, 2023, and December 22, 2023, letters challenged in this lawsuit.

9.     Defendant the Centers for Medicare and Medicaid Services is a federal agency organized under the laws of the United States. It is responsible for federally administering Medicaid and for approving State applications for demonstration projects and waivers under Medicaid. CMS maintains a regional office in the State of Georgia for administering its operations in Alabama, Florida, Georgia, Kentucky, Mississippi, North Carolina, South Carolina, and Tennessee.

10.     Defendant Xavier Becerra, sued in his official capacity, is the Secretary of the Department of Health and Human Services. He is charged by statute with approving demonstration projects and waivers.

11.     Defendant United States Department of Health and Human Services ("HHS") is a federal agency organized under the laws of the United States. It is responsible for administering federal healthcare policy and is the cabinet-level Department of which CMS is a part.

12.     Defendant United States of America is the federal sovereign.

## JURISDICTION & VENUE

13.     This Court has subject-matter jurisdiction over this case because it arises under the Constitution and laws of the United States. *See* 28 U.S.C. §§1331, 1346, 1361, 2201; 5 U.S.C. §§701-706.

14.     This Court may grant declaratory and injunctive relief under 5 U.S.C. §706, 28 U.S.C. §§1361, 2201, and 2202, and its inherent equitable powers.

15.     Venue is proper in this district because Defendants are United States agencies or officers sued in their official capacities, the State of Georgia is a resident of this judicial district, and no real property is involved. *See* 28 U.S.C. §1391(e)(1); *Atlanta & F.R. Co. v. W. Ry. Co. of Ala.*, 50 F. 790, 791 (5th Cir. 1892); *see also California v. Azar*, 911 F.3d 558, 570 (9th Cir. 2018); *Alabama v. U.S. Army Corps of Engineers*, 382 F. Supp. 2d 1301, 1329 (N.D. Ala. 2005) ("[A] state may bring suit under 28 U.S.C. § 1391(e)(3) in any district within the state."). Venue is especially appropriate here given that this Court resolved the prior litigation between Georgia and CMS from which the current suit arises.

16.     Georgia has standing to challenge CMS' Denial of its request to amend the end date of Pathways because it will suffer direct injury as well as injury in its quasi-sovereign and parens patriae capacities. Georgia has invested substantial resources in direct reliance on the Georgia Pathways Approval. Georgia has also amended its laws and policies in reliance on Pathways. S.B. 106 (2019) *codified as* O.C.G.A. §49-4-142.3. Moreover, Georgia has expended significant manpower to implement the program and will be forced to expend even more if its request to amend the program is denied. Finally, the Denial prevents Georgia from evaluating and assessing the effectiveness of the demonstration waiver.

## BACKGROUND

### I.     Overview of Medicaid.

17.     As originally enacted in 1965, Medicaid required States to cover only "certain discrete categories of needy individuals—pregnant women, children, needy families, the blind, the elderly, and the disabled." *Nat'l Fed'n of Indep. Bus. v. Sebelius*, 567 U.S. 519, 575 (2012); *see also* 42 U.S.C. §1396a et seq.; *see also Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985) (noting that Congress designed Medicaid to "subsidize[ ]" States in "funding ... medical services for the needy"). In the wake of the Patient Protection and Affordable Care Act (ACA) and the Supreme Court's holding in *NFIB v. Sebelius*, States

have a choice to "expand medical coverage to low-income adults who did not previously qualify" for Medicaid. *Gresham v. Azar*, 950 F.3d 93, 96 (D.C. Cir. 2020).

18.     Medicaid is the quintessential "cooperative federalism" program. *King v. Smith*, 392 U.S. 309, 316 (1968). It is "financed largely by the federal government" but "administered by the States." *Id.*; *see also Georgia Hosp. Ass'n v. Dep't of Med. Assistance*, 528 F. Supp. 1348, 1351 n.1 (N.D. Ga. 1982) ("Title XIX of the Social Security Act, 42 U.S.C. s 1396, et seq., provides for the establishment of cooperative Federal-State programs, commonly called 'Medicaid,' to provide payments for "necessary medical services" rendered to qualified 'needy individuals whose income and resources are insufficient to meet the costs of these services.'").

19.     The Social Security Act charges the Secretary of Health and Human Services with a wide range of administrative responsibilities relating to maintaining the programs under HHS's purview, including Medicaid. *See* 42 U.S.C. §301 et seq.

20.     States that elect to participate in Medicaid must propose comprehensive State plans that meet federal requirements. *See* 42 U.S.C. §1396a; 42 C.F.R. §§430.10-25. "Once each plan is approved, the States 'administer Medicaid with little to no oversight, but the federal government pays a large portion of state administrative expenses.'" *Texas v. Brooks-LaSure*, 2021 WL 5154219, at *1 (E.D. Tex. Aug. 20, 2021) (quoting Nicole Huberfeld, *Federalizing Medicaid*, 14 U. Pa. J. Const. L. 431, 447 (2011)); *see also Georgia Hosp. Ass'n*, 528 F. Supp. 1348, 1351 (N.D. Ga. 1982) ("The various Medicaid programs, once approved, are administered by the respective States.").

21.     The portion of each State's Medicaid program that is subsidized by the federal government varies by State and is based on a federal medical-assistance percentage (FMAP). Georgia's FMAP is currently 66.04%. *See Federal Medical Assistance Percentage (FMAP) for Medicaid and Multiplier*, KFF, https://perma.cc/D4GE-F5VC.

22.     The Centers for Medicare & Medicaid Services, a federal agency within the Department of Health and Human Services, has primary responsibility for overseeing the Medicare and Medicaid programs.

## II.     Section 1115 Demonstration Projects.

23.     "To make sure that Medicaid's general requirements do not stand in the way of useful innovation in low-income healthcare coverage, Section 1115 of the Social Security Act allows states, with the permission of the federal government, to experiment with innovative approaches to Medicaid administration." *Georgia v. Brooks-LaSure*, 2022 WL 3581859, at *2 (S.D. Ga. Aug. 19, 2022); *see also* S. Rep. No. 87-1589, at 19 (1962), *reprinted in* 1962 U.S.C.C.A.N. 1943, 1961. To this end, Section 1115 allows States and the federal government to work collaboratively to implement innovative Medicaid programs. Although Medicaid establishes certain minimum requirements, Section 1115 allows States to deviate from them in the form of "experimental, pilot, or demonstration project[s]." 42 U.S.C. §1315(a). Section 1115 authorizes the Secretary to approve "any experimental, pilot, or demonstration project which, in the judgment of the Secretary, is likely to assist in promoting the objectives" of Medicaid. *Id.*; *see also Brooks-LaSure*, 2022 WL 3581859, at *2 (describing Section 1115). The Social Security Act authorizes the Secretary of HHS to approve these projects. 42 U.S.C. §1315(a). The Secretary has largely delegated this authority to CMS' Administrator. 42 C.F.R. §430.25(f)(2).

24.     Section 1115 allows a State to propose an alternative plan that varies from the Social Security Act's default requirements and serves the goals of Medicaid and Medicaid beneficiaries within the State. *See Brooks-LaSure*, 2022 WL 3581859, at *2. Such "§ 1115 demonstration projects provide benefits to people who wouldn't otherwise be eligible for Medicaid benefits; and the costs of these benefits are treated as if they are matchable Medicaid expenditures." *Id.* (quoting *Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 224 (5th Cir. 2019)).

III.     **Georgia Develops the Pathways to Coverage Demonstration.**[2]

25.     In 2019, Georgia decided to pursue a Section 1115 waiver for an innovative new program that would deliver coverage to tens of thousands of additional participants while also ensuring that the recipients were taking steps to better themselves and their communities. O.C.G.A. §49-4-142.3 (authorizing Section 1115 waiver request). The State began the process by researching other states' experiences with expansion, conducting environmental scans of Georgia's population, and analyzing potential options.

26.     Georgia officials held meetings with CMS officials in late 2019 to work collaboratively to develop the waiver and incorporate a qualifying hours and activities requirement for newly eligible recipients that would require them to complete a minimum number of hours of work, education, job training, community service, or other similar activities to receive and maintain coverage.

27.     These collaborative meetings continued regularly, often weekly, into 2020. Starting in February 2020, CMS and the State began engaging in weekly negotiation calls to discuss various elements of Georgia's application. In these exhaustive give-and-take negotiations, CMS made several recommendations to alter Georgia's plan. At CMS' request, Georgia provided additional avenues to eligibility for those affected by COVID-19 or with disabilities protected by the ADA. *Id.*

28.     These negotiations resulted in a comprehensive plan that benefitted all stakeholders. Each side made compromises. CMS advanced its goal of expanding Medicaid coverage to individuals in Georgia who were not otherwise eligible. Georgia advanced its goal of sustainably increasing coverage while promoting activities to help individuals attain independence and self-reliance. Georgians with income up to 100% of the federal poverty level became eligible for Medicaid benefits for the first time. In short, even though Georgia had no obligation to expand eligibility, the State

---

[2] The Georgia Pathways documents referenced in this Complaint can be found at https://perma.cc/9NK6-5PFR.

worked with CMS in good faith to adopt an innovative program to deliver coverage to a new category of individuals while helping them build important skills and become more independent and self-reliant.

## IV.   Georgia Pathways to Coverage.

29.     The compromise plan that emerged from this exhaustive negotiation, analysis, and public input is called "Georgia Pathways to Coverage." Georgia Pathways is an innovative program to voluntarily expand Medicaid coverage to tens of thousands of otherwise-ineligible, low-income Georgians while ensuring that those individuals were taking steps to build skills, find work, complete additional education, or volunteer in their communities.

30.     Georgia Pathways provides Medicaid coverage to low-income adults ages 19-64, with incomes up to 95 percent of the federal poverty line (FPL) (effectively 100 percent with the 5 percent income disregard), who are not otherwise eligible for Medicaid coverage.

31.     The central component of Georgia Pathways is its pathway to coverage for those otherwise ineligible for Medicaid. This pathway—the eligibility mechanism—requires that to qualify and maintain eligibility, applicants must complete a minimum of 80 hours of qualifying activities in the month prior to approval. Pathways participants must then complete 80 hours of qualifying activities per month to maintain eligibility.

32.     A wide range of activities can be used to satisfy the 80-hour requirement including: unsubsidized employment, subsidized private sector employment (including self-employment), on-the-job training, specified job readiness activities, certain community service activities, specified vocational educational training, and enrollment in an institution of higher education.

33.     As part of the approved Georgia Pathways demonstration, Georgia agreed to provide reasonable accommodations to enable individuals with disabilities (who are not otherwise eligible for Medicaid on the basis of disability) to meet the qualifying hours requirement.

34.     Georgia also agreed to allow participants enrolled in the demonstration who had been compliant with the qualifying hours requirement but who become unable to comply with the requirements moving forward for good cause to have a maximum of 120 hours of noncompliance during the benefit year. These good cause circumstances include, but are not limited to: the participant or an immediate family member is hospitalized; the participant or an immediate family member experiences a serious illness; the participant experiences a short-term injury or illness; the participant experiences the birth, adoption, or death of an immediate family member; the participant accepts a foster child or kin-ship care placement; the participant experiences a natural or human-caused disaster (including a public health emergency); the participant has a family emergency or other life event (e.g., divorce, civil legal matter, or is a victim of domestic violence); the participant is temporarily homeless; or other good cause reasons as defined and approved by the State.

## V.     CMS Approves Pathways for Five Years.

35.     On October 15, 2020, CMS formally approved Pathways as a Section 1115 demonstration project. The full parameters of the demonstration were enshrined in eighty Special Terms and Conditions (STCs) signed by Georgia and CMS.

36.     The STCs' first paragraph established the project's length: "[t]he Georgia Pathways to Coverage demonstration . . . is approved for a *5-year period* from October 15, 2020 – September 30, 2025." STC at 1 (emphasis added). This reflected CMS' customary practice of approving Section 1115 demonstrations "for an initial five-year period." Medicaid, *About Section 1115 Demonstrations*, medicaid.gov (accessed January 5, 2024), https://perma.cc/4DUY-8FXJ.

37.     The parties further agreed that Georgia would implement the project on July 1, 2021. STC at 1.

**VI.    The Parties Establish Procedures for Changing or Ending the Demonstration.**

38.     The parties also established different sets of procedures for amending, extending, and terminating or withdrawing Pathways.

39.     ***Amendment***. Although Georgia was given broad discretion over most aspects of the demonstration, the parties agreed in STC 6 that certain changes required CMS' preapproval. These included amendments "related to eligibility, enrollment, benefits, beneficiary rights, delivery systems, cost sharing, sources of non-federal funding, budget neutrality," and, as a catch all, "other comparable program elements." STC ¶6. STC 7 requires amendment requests to include certain documentation including an explanation of the public process used to develop the proposal, a description of the amendment's impact on beneficiaries, data analysis of the amendment's budgetary effects, and other submissions. STC ¶7; 59 Fed. Reg. 49249-01.

40.     ***Extension***. Requests to extend the demonstration "beyond the period authorized in these STCs" trigger several considerably more onerous requirements. Before even requesting a formal extension, the State "must provide at least a 30-day public notice and comment period regarding applications for a demonstration project, or an extension of an existing demonstration project …." 42 C.F.R. §431.408(a) (incorporated by STC ¶¶8 and 12).  The public notice of the comment period must include a "comprehensive description" of the application or extension including, inter alia, a description of the program goals and objectives; an estimate of enrollment and expenditures, including a financial analysis of the extension request; and the hypothesis and evaluation parameters of the demonstration.

41.     The extension application itself also requires the State to provide exhaustive research and data about the program. Under CMS regulations, "[a]n application to extend an existing demonstration will be considered complete . . . when the State provides the following:

(i)      A historical narrative summary of the demonstration project, which includes the objectives set forth at the time the demonstration was approved, evidence of

how these objectives have or have not been met, and the future goals of the program.

(ii) If changes are requested, a narrative of the changes being requested along with the objective of the change and the desired outcomes.

(iii) A list and programmatic description of the waivers and expenditure authorities that are being requested for the extension period, or a statement that the State is requesting the same waiver and expenditure authorities as those approved in the current demonstration.

(iv) Summaries of External Quality Review Organization (EQRO) reports, managed care organization (MCO) and State quality assurance monitoring, and any other documentation of the quality of and access to care provided under the demonstration, such as the CMS Form 416 EPSDT/CHIP report.

(v) Financial data demonstrating the State's historical and projected expenditures for the requested period of the extension, as well as cumulatively over the lifetime of the demonstration. This includes a financial analysis of changes to the demonstration requested by the State.

(vi) An evaluation report of the demonstration, inclusive of evaluation activities and findings to date, plans for evaluation activities during the extension period, and if changes are requested, identification of research hypotheses related to the changes and an evaluation design for addressing the proposed revisions.

(vii) Documentation of the State's compliance with the public notice process set forth in § 431.408 of this subpart, including the post-award public input process described in § 431.420(c) of this subpart, with a report of the issues raised by the public during the comment period and how the State considered the comments when developing the demonstration extension application."

42 C.F.R. §431.412(c)(2) (cited by STC ¶8).

42. Finally, an extension request will be considered only if it is submitted at least 12 months before the expiration date of the demonstration. 42 C.F.R. §431.412(c) (cited by STC ¶8).

43. ***Termination or Withdrawal.*** The parties handled attempts to terminate or withdraw from the demonstration in a supplemental agreement. That document, dated January 4, 2021, emphasizes that "[b]y their nature, section 1115 demonstrations represent a contract between the state and federal government." In the agreement, CMS and Georgia agreed to a comprehensive process

affording Georgia full notice and an opportunity to be heard in the event CMS sought to withdraw the demonstration.

## VII.  Georgia Invests Significant Resources to Implement Pathways in Reliance on CMS' Approval.

44.    With the structure of the project in place, and in direct reliance on CMS' approval, Georgia made earnest and good faith efforts to implement Pathways. In FY 2021, Georgia appropriated $65,450,836 to cover benefits for projected enrollment for the first year of the demonstration. Georgia also conducted discussions and began program implementation activities with Care Management Organizations ("CMOs"), contracted vendors for eligibility and enrollment, contracted vendors for third-party liability, and contracted vendors for customer service support and general project management. Georgia hired and assigned 31 state employee personnel full-time equivalents to support Pathways implementation project activities and started the process of hiring dozens of additional employees to staff the project.

45.    Georgia's CMOs implemented changes in order to receive Pathways assignments and made adjustments to receive the capitation payments for Pathways coverage. Moreover, CMOs had to make numerous updates in accordance with the Pathways readiness requirements.

46.    Georgia also began submitting quarterly monitoring reports to CMS.

## VIII.  CMS Reconsiders Its Approval of Pathways.

47.    In February 2021, as Georgia actively worked to uphold its end of the bargain, it received two letters from CMS.

48.    In its first letter, dated February 12, 2021, CMS told Georgia it was considering withdrawing authorization for two key aspects of Pathways. As justification, CMS said it had "preliminarily determined that allowing work and other community engagement requirements to take effect in Georgia would not promote the objectives of the Medicaid program." Consequently, CMS said it was "commencing a process of determining whether to withdraw the authorities approved in

the Pathways to Coverage demonstration that permit the state to require work and other community engagement activities as a condition of Medicaid eligibility while leaving in place the demonstration's other provisions, including the extension of Medicaid eligibility to certain otherwise-ineligible individuals." The sole stated rationale CMS offered for its abrupt about-face was COVID-19.

49.     The second letter, also dated February 12, 2021, purported to unilaterally withdraw the January 4, 2021, supplemental agreement governing termination and withdrawal. The letter cited "CMS' need for flexibility to make and effectuate determinations under 42 C.F.R. 431(d)(1)-(2)."

50.     Georgia responded on March 12, 2021, explaining that rescinding the demonstration in whole or in part would be unlawful and arbitrary. Georgia also disputed CMS' authority to unilaterally rescind the January 4, 2021, supplemental agreement because "CMS did not identify any 'changed circumstances' in the thirty-two days between January 4 to February 12, nor could it."

## IX.   After Ten Months of Silence, CMS Reneges on Pathways.

51.     For the next several months, CMS did not respond. So, in June 2021, with Pathways' implementation date looming, Georgia sent a letter to CMS proposing to postpone Pathways until at least August 1, 2021. Georgia explained that its proposal was motivated by CMS' "continuing . . . examination of the status of the authorities approved for the Pathways demonstration." After another month elapsed without a response from CMS, Georgia sent a follow-up letter on July 27, 2021, stating that it "ancipate[d] [a] delay extending to the end of the calendar year."

52.     Georgia's decision to postpone Pathways was the logical response to CMS' preliminary determination that Pathways did not promote the ends of Medicaid and its unilateral cancellation of the parties' January 4 supplemental agreement. Georgia also feared being saddled with massive financial obligations in the event CMS refused to pay its portion of the FMAP for the Pathways beneficiaries.

53.     Then, without a public comment period, on December 23, 2021, CMS sent Georgia a letter (hereinafter "the Recission") purporting to rescind Georgia's authority to implement the qualifying activities and premium components of Georgia Pathways. The Recission, however, stated that it was leaving in place the part of Georgia Pathways expanding Medicaid coverage to certain able-bodied adults. In other words, CMS allowed the Medicaid expansion to proceed while stripping out the qualifying hours and premium requirements that were indispensable to the State's decision to participate in the demonstration program in the first place, and without which rendered the demonstration a condition-free Medicaid expansion.

**X.     This Court Grants Summary Judgment for Georgia and Vacates the Rescission.**

54.     In January 2022, roughly one month after CMS rescinded approval, Georgia filed a lawsuit challenging the Recission. Georgia argued, among other things, that the Recission violated the parties' agreement, the Administrative Procedure Act, the Social Security Act, and the Spending Clause. *See Brooks-LaSure*, 2022 WL 3581859, at *7. The parties cross-moved for summary judgment.

55.     On August 19, 2022, this Court granted summary judgment for Georgia and vacated the Rescission. *Id.* at *1. As a threshold matter, the Court found that the Rescission was judicially reviewable pursuant to Section 1115's "standard for reasoned discretion–whether the [Pathways] demonstration is 'likely to assist in promoting the objectives of Medicaid.'" *Id.* at *11.

56.     Applying that standard, this Court held the Rescission was arbitrary and capricious, failing every prong of the reasonableness inquiry "many times over." *Id.* Specifically, this Court held that CMS: "failed to consider or weigh the possibility that the rescission would result in less Medicaid coverage in Georgia," *id.* at *9; wrongly measured Pathways against a baseline of full Medicaid expansion, "rather than taking the demonstration on its own terms," *id.* at *9, *12; relied on "inapt comparisons" to demonstrations that applied work requirements to *current* beneficiaries, not to otherwise-ineligible *future* beneficiaries, *id.* at *15; "relied on an impermissible factor: 'health equity,'"

*id.* at *16; "failed to consider or weigh reliance interests" stemming from its original decision to approve the program., *id.* at 49; and "ultimately failed to explain the Agency's reasons for changing its mind about the key issues underlying the approval." *Id.* at *9.

57.     The Court thus held that "[i]n addition to failing to address a key aspect of the problem, [CMS'] explanation for its decision relied on an incorrect baseline; drew key support from blatantly inapt comparisons; imported impermissible factors; failed to consider whether there were reliance interests and how weighty they were; and, ultimately, failed to explain why the Agency now believes the Pathways demonstration would not further the purpose of Medicaid." *Id.* at *21. Because CMS' decision "rested on numerous, profound flaws," the Court vacated the Rescission wholesale. *Id.*

## XI.    Georgia Prepares to Restart Pathways.

58.     With the Rescission vacated, Georgia began the complex, time-consuming process of restarting Pathways.

59.     Because of the long delays caused by CMS' Rescission, Georgia had to reassemble major components of Pathways from all-but scratch. Due to significant technology changes during the long delay, Pathways' website and online system needed a complete redesign. Training modules needed to be written so that new hires and existing employees could get up-to-speed. New digital storage systems for Pathways data needed to be created, managed, and supported. Contracts with outside vendors and technology support firms needed to be negotiated and signed. And the whole system would need to undergo extensive evaluation and testing, both by Georgia and CMS.

60.     Georgia made good use of the time. By October 2022, Georgia had already gathered the updated cost and enrollment projection data needed to support funding requests and redesign decisions. By November, Georgia had a comprehensive internal plan to implement Pathways by Summer 2023. Throughout these months, Georgia engaged in contract discussions with the vendor partners needed to support Pathways.

61.     On December 16, 2022, Georgia sent CMS a substantial submission called the Implementation Advance Planning Document (IAPD), which outlined Georgia's funding request for and proposed implementation plan for Pathways. This wasn't Georgia's first time submitting an IAPD. In 2020, Georgia had submitted an IAPD for Pathways, which CMS approved in just under a month. But due to the significant changes necessitated by the Rescission and several intervening years, Georgia recompiled the document and resubmitted it for CMS' approval.

62.     This time, CMS did not approve the Pathways IAPD. Instead, CMS sent Georgia a long list of questions requiring detailed, resource-intensive answers, such as "a breakdown of enhancement/refreshment work that needs to be performed" with "relevant information such as functionality involved, type of work, level of effort, cost, contractor involved, timeline, etc." and "a project management plan that shows in detail the work to be completed, timeline, major milestones, resources involved, constraints and dependencies, and other information that assures CMS the State will be able to complete the estimated work in the 18-months (or so) outlined in the State's IAPD." Notably, CMS' burdensome requests forced Georgia to compile yet additional documentation describing the changes necessitated by CMS' own unlawful actions.

63.     Even with the short timeline and CMS' additional requests, by Spring 2023, Georgia was on track to restart Pathways on July 1, 2023—exactly two years after the original target implementation date, and nearly three years after initial approval.

**XII.   Georgia Seeks to Implement the Full 5-Year Demonstration it was Promised.**

64.     On February 24, 2023, Georgia sent a letter to CMS asking to revise Pathways' end date to September 30, 2028 (hereinafter, the "Request") to reflect the 5-year demonstration originally agreed to in the STCs. This revision, Georgia explained, "would provide the state with a full five-year period in which to operate, monitor, evaluate, and assess [Pathways'] effectiveness." Request at 1. Georgia emphasized that a revision was appropriate in light of "the significant delay in implementation

caused by approximately eight months of a withdrawn waiver" and "the loss of Demonstration Years 1, 2, and 3" due to CMS' unlawful Rescission. *Id.*

65.     Georgia further explained that Pathways' original evaluation design sought to test the program's effectiveness at achieving certain objectives "***over a five-year period***." *Id.* (emphasis in original). Without an extension, Georgia would be forced to begin winding down Pathways without any opportunity to test and evaluate the baseline data collected in year 1, prohibiting any meaningful analysis over time. *Id.*

66.     Georgia also noted that more time was needed to allow the demonstration to reach its full potential. Because Pathways was "a new program and members must 'opt in'" Georgia "anticipate[d] it [would] take time for enrollment to peak and to collect and analyze a sufficient amount of data for the baseline calculations." *Id.*

67.     Finally, Georgia noted that without a revision, it would be forced to rush through a burdensome extension request while the program was still in a nascent phase. Request at 5; *see also* STC ¶¶8, 12 *and* 42 C.F.R. 431.408. Such a request would be necessarily incomplete and premature, given that Georgia would have "just collected its baseline data" without any opportunity to "conduct any comparisons or perform . . . evaluation activities" before the extension deadline. Request at 5.

68.     Once again, CMS declined to definitively respond before the project's (new) planned implementation date. Instead, it informally signaled that the request would not be granted, while withholding a formal response for months. Notably, CMS personnel admitted during discussions that Pathways was "prepared initially in the context of the full five-year demonstration period," and that the shortened timeline "le[ft] the state a *truncated* period of 27 months for implementing the demonstration during the approval period."

69.     Undeterred, Georgia began enrolling applicants in July 2023. Over the next few months, thousands of Georgians applied for Pathways. Of these, a significant percentage of applicants

who were otherwise ineligible for Medicaid obtained coverage. Pathways also expanded Medicaid access overall, since a sizeable number of applicants were determined eligible for traditional Medicaid after completing the screening process. Request at 5.

## XIII.   CMS Denies Georgia's Request to Revise Pathways' End Date.

70.    As Pathways ramped up, on October 5, 2023—after nearly eight months without a formal response—CMS denied Georgia's Request to amend the project's end date (hereinafter the "Denial" or the "October Letter"). Notably, CMS made no attempt to justify its denial on the merits. In fact, CMS omitted any reference to its own unlawful conduct, the cause of the project's delays, or this Court's August 2022 decision.

71.    Instead, CMS fixated on supposed procedural deficiencies in Georgia's Request. First, CMS found that Georgia's request was "properly considered an extension," not an amendment, because a request to revise the end dates was not among the type of amendments expressly enumerated in STC 6. Denial at 1. CMS also noted that Georgia did not provide a public notice and comment period regarding any purported extension, as required by regulations. *Id.* Accordingly, CMS found that the Request "[did] not meet the minimum requirements for CMS to consider an extension request" under STC 8. *Id.*

72.    Missing from CMS' Denial was any explanation of how Georgia, without any underlying project data, could have compiled the extensive supporting documentation required for a formal extension request. *See supra* Part VI. In conclusory fashion, CMS faulted Georgia for not submitting this information, ignoring the fact that Georgia's lack of sufficient data resulted from CMS' own unlawful actions, which significantly delayed Pathways' launch.

73.    On similar grounds, CMS also refused to consider Georgia's letter as an amendment request. Denial at 1–2. Specifically, CMS faulted Georgia for failing to provide "a data analysis worksheet outlining the budget neutrality agreement, a description outlining the impact on

beneficiaries and existing demonstration reporting, and quality and evaluation plans." *Id.* CMS misconstrued Georgia's request as an attempt to extend the demonstration, ignoring the fact that CMS had already approved the project for a five-year period and Georgia was simply seeking to implement the program for the full authorized term.

## XIV.   Georgia Requests Reconsideration of CMS' Denial.

74.     On November 16, 2023, Georgia sent a letter asking CMS to reconsider the Denial (hereinafter the "November Letter"). Georgia first explained that it was not requesting an "'extension' in the classic sense of allowing a demonstration project to last longer than its originally authorized term." November Letter at 1. Rather, "the sole purpose of [Georgia's] request was to ensure [it] was able to implement its program for the originally authorized five-year term." *Id.* Georgia also pointed out that CMS was solely responsible for the two-year implementation delay to Pathways and the protracted legal proceedings before the agency and in federal court. *Id.* at 2. And Georgia explained that the Denial ran counter to this Court's decision, which found that CMS' decision to withdraw and rescind its approval was arbitrary and capricious. *Id.* at 2.

75.     Georgia also contended that CMS had misconstrued the nature of its request and ignored the STCs' plain language. *Id.* at 3. The request, Georgia pointed out, fell comfortably within STC 6's catch-all clause covering amendments to "other comparable program elements." *Id.* The STCs did not "expressly prohibit[] CMS from amending the demonstration and extending the end date to make the State whole for . . . CMS' unlawful actions." *Id.*

76.     Georgia further argued that requiring it to file a formal extension request made "no sense," given that the Pathways program "[was] still in its infancy due to the lengthy delays caused by CMS' unlawful rescission." *Id.* at 4. Georgia pointed out that after just a few months of implementation, Pathways had not generated "sufficient historical data to determine what, if any, program changes are needed" or "data regarding its historical and projected expenditures for the

requested period of the extension, as well as cumulatively over the lifetime of the demonstration," among other benchmark data points. *Id.* at 5. Moreover, "it would be arbitrary and capricious to fault Georgia for not submitting this information given that the only reason for the insufficient data [was] CMS' own unlawful actions." *Id.*

77. Citing this Court's opinion, Georgia emphasized that "because Pathways is an expansion of coverage to individuals not otherwise eligible, any attempt by CMS to limit or curtail the program would 'result in *less* Medicaid coverage for Georgians.'" *Id.* at 6.

78. Georgia concluded by reiterating its request that CMS "reconsider and reverse its October 5, 2023 denial and restore the originally authorized five-year demonstration period." *Id.* at 6.

**XV.   CMS Denies Georgia's Request for Reconsideration.**

79. On December 22, 2023, CMS sent a letter affirming the Denial (hereinafter the "December Letter"). Far from providing additional support for its decision, CMS' stated rationales were even more absurd than the initial Denial. First, CMS implied that the two-year implementation delay was Georgia's fault, suggesting that it "could be related to operational constraints, readiness delays, and/or other factors." December Letter at 1.

80. Next, CMS said that it was not responsible for any delay in 2021 because Georgia could have simply implemented Pathways without the qualifying hours, activities, and premium requirements that CMS had threatened to cancel in its February letters. *Id.* CMS also asserted that because these authorities were not officially withdrawn until December 2021, any delays in 2021 were chargeable to Georgia's "cho[ice] to delay implementation." *Id.*

81. After repeating the alleged procedural defects raised in its October Letter, CMS concluded by saying it "believed that the current implementation period . . . should provide sufficient data to help understand the preliminary effects of the demonstration." *Id.*

82.     As explained in greater detail below, CMS' Denial, as originally stated and reaffirmed in its December Letter, is based on arbitrary reasoning and numerous errors of fact and law. CMS never explained how Georgia could be faulted for not providing detailed historical data and reports in February 2023 for a project that would not start until July 2023. CMS also glossed over the fact that its own unlawful actions had caused the extensive delays and prevented Pathways from generating any information for Georgia to report. Nor did CMS explain why Georgia needed to pursue additional rounds of notice and comment for an "amendment" or "extension" that simply reinstated the originally authorized 5-year term of the demonstration.

83.     In short, CMS' Denial rests on two faulty premises: first, that Georgia's amendment request was deficient because it failed to use data that didn't yet exist to publicly notice, document, and describe "changes" to a demonstration that—because of CMS' unlawful conduct—hadn't started. Second, that a limited, two-year demonstration curtailed by CMS' illegal acts was just as good as the fully implemented, five-year demonstration CMS originally approved.

84.     More fundamentally, the Denial represents a brazen attempt by CMS to elide this Court's decision and punish Georgia for CMS' illegal conduct. But-for CMS' illegal Rescission, Georgia could have implemented Pathways on time for the fully authorized term. Instead, Georgia has been forced to expend enormous resources and effort vindicating its rights in this Court and reassembling a project that nearly never saw the light of day due to CMS' unlawful actions. Yet CMS now refuses to make Georgia whole for the lost time caused by CMS' unlawful Rescission.

**XVI.   Consequences of CMS' Withdrawal.**

85.     If the Denial stands, it will have devastating consequences for Georgia and its citizens. After expending enormous resources, enacting legislation, and establishing policies, Georgia will likely be forced to wind down a program after just two years, after devoting even more effort to a

burdensome, albeit futile, extension request. This would be a monumental waste of Georgia's resources and time.

86.     Additionally, without a revised effective period, Georgia will be forced to wind down the program after enrolling large numbers of otherwise-ineligible applicants in Medicaid. This would deprive thousands of Georgians their Medicaid coverage and remove access to Medicaid for untold numbers of potential future applicants. In finding the Rescission to be arbitrary and capricious, this Court repeatedly emphasized that CMS never fully grappled with the fact that its actions would ultimately result in less Medicaid coverage for Georgians. The déjà vu is palpable. Once again, CMS seeks to deprive Georgia of its ability to fully implement the Pathways program as originally authorized—to the ultimate detriment of the citizens who will lose the opportunity to receive coverage under the truncated program.

## CLAIMS FOR RELIEF

### COUNT I
### Contrary to Law – Violation of the Parties' Contractual Agreement
### (5 U.S.C. §706)

87.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

88.     By denying Georgia's Request to honor the demonstration's original five-year duration, CMS has altered the State's rights and obligations. *See, e.g.*, *Alabama v. Ctrs. for Medicare & Medicaid Servs.*, 780 F. Supp. 2d 1219, 1228 (M.D. Ala. 2011), *aff'd*, 674 F.3d 1241 (11th Cir. 2012) ("[T]he terms of the SHO letter impose legal obligations on the states that neither the plain language of the Medicaid Act nor the regulations promulgated by CMS impose."); S*tate v. Ctrs. For Medicare & Medicaid Servs.*, 2010 WL 1268090, at *5 (M.D. Ala. Mar. 30, 2010) ("In its amended complaint, Plaintiff alleges that the SHO Letter has harmed Alabama because it has limited the state's ability to negotiate

settlements in current Medicaid fraud and abuse litigation. . . . Therefore, all counts alleged by Alabama that are also fit for judicial decision are ripe.").

89.     The denial of Georgia's request to amend the demonstration's end date is a final agency action. *See In re MDL-1824 Tri-State Water Rts. Litig.*, 644 F.3d 1160, 1184 (11th Cir. 2011) (Defining a final agency action is one "by which rights or obligations have been determined, or from which legal consequences will flow"); *see also Texas v. Brooks-LaSure*, 2021 WL 5154219, at *5 (E.D. Tex. Aug. 20, 2021) ("[T]he rescission letter determines rights and has legal and practical consequences.").

90.     Section 1115 demonstrations represent a contract between the State and the federal government.

91.     CMS' Denial constitutes a reduction of the demonstration period from five years to two, contradicting a core term of the contract between Georgia and CMS embodied in the Special Terms and Conditions. STC at 1. Georgia would not have undergone the lengthy and burdensome process of developing, legislating, and negotiating the Pathways demonstration only to see it terminated after two years. This is not what Georgia "voluntarily and knowingly" accepted when it signed the STCs.

92.     CMS' Denial violates a core term of the agreement by preventing Georgia from implementing the Georgia Pathways program for 5 years.

## COUNT II
### Contrary to Law – Violation of Section 1115
### (5 U.S.C. §706)

93.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

94.     CMS has only the powers conferred on it by statute. *La. Pub. Serv. Comm'n v. F.C.C.*, 476 U.S. 355, 374 (1986) ("[A]n agency literally has no power to act, let alone pre-empt the validly enacted legislation of a sovereign State, unless and until Congress confers power upon it."). And CMS

cannot expand those powers by regulation. *See, e.g., id.* ("An agency may not confer power upon itself."); *see also Civil Aeronautics Bd. v. Delta Airlines, Inc.*, 367 U.S. 316, 334 (1961).

95.     Section 1115 authorizes CMS to "waive compliance with" Medicaid requirements, 42 U.S.C. §1315(a)(1), to promulgate regulations relating to demonstration projects, *id.* §1315(d)(1), (2), and to approve or disapprove extensions of demonstration projects, *id.* §1315(f).

96.     Section 1115 provides CMS with no authority to unilaterally shorten an already approved demonstration through committing unlawful acts. Indeed, by giving CMS a single approve-or-deny decision regarding a demonstration, Section 1115 requires finality. Thus, CMS has the power to approve or deny a demonstration, but not the ability to unilaterally alter the demonstration's core terms after the fact. As the Fifth Circuit has observed, "[o]nce the [Administrator] authorizes a demonstration project, no take-backs." *Forrest Gen. Hosp.*, 926 F.3d at 233. This makes perfect sense— a demonstration project is typically a massive and expensive undertaking, and it would be profoundly inequitable to allow CMS to change the rules after a project has already been approved.

97.     Nor can CMS rely on its authority to "approve or disapprove extensions of demonstration projects," because Georgia is not requesting an "extension" of the demonstration period under the express terms of the parties' agreement. In STC 8, the parties agreed that Georgia must submit a formal request for an extension "*beyond* the period authorized in these STCs." STC at 1, ¶8. That "period," in turn, was defined in the contract: "Georgia Pathways . . . is approved for a *5-year period.*" STC at 1 (emphasis added). Accordingly, Georgia's Request does not seek to extend the demonstration *beyond* five years, but rather a reaffirmation that the demonstration period *is* five years.

98.     By refusing to revise the project's end date to reflect the reality that CMS rendered it impossible for the five-year demonstration to occur between 2020 and 2025, CMS is doubling down on its illegal alteration of the demonstration that this Court previously vacated. In essence, CMS' Denial seeks to achieve by practical effect what it failed to do administratively—ensure the Pathways

demonstration agreed to in the STCs can never be fully implemented. But Congress has not authorized CMS to approve projects, unilaterally cancel them, then charge any resulting delay to the State. CMS' Recission is beyond its statutory authority and contrary to law.

99.     By refusing to honor its commitment to approve Pathways for a five-year period, CMS has acted beyond its statutory authority.

### COUNT III
### Contrary to Law – Violation of Section 1115 and Social Security Act
### (5 U.S.C. §706)

100.     Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

101.     CMS' Denial conflicts with the text and any discernible purpose of the Social Security Act. Congress designed Medicaid to "subsidize[ ]" States in "funding ... medical services for the needy." *Alexander v. Choate*, 469 U.S. 287, 289 n.1 (1985). And the Medicaid program is designed "[t]o enable states to 'furnish ... medical assistance'—i.e., healthcare services—to certain vulnerable populations and to furnish those populations with rehabilitation and other services to help them 'attain or retain capability for independence or self-care.'" 42 U.S.C. §1396. Rather than further these aims, CMS' truncation of the program will deprive many otherwise ineligible Georgians of the opportunity to obtain Medicaid coverage.

102.     The bottom line is that, far from promoting the purposes of the Medicaid statutes, CMS' Denial will ultimately result in *less* coverage. Tens of thousands of Georgians who would be eligible to enroll in Georgia Pathways during a five-year demonstration would lose that ability in a truncated two-year demonstration. Accordingly, the Denial is contrary to the text and purpose of the Social Security Act. *Brooks-LaSure*, 2022 WL 3581859, at *23.

## COUNT IV
### Arbitrary and Capricious
### (5 U.S.C. §706)

103.    Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

104.    The Denial is arbitrary and capricious for several reasons. Each is an independently sufficient ground to vacate.

105.    *First*, CMS failed to consider that the Denial would ultimately result in less Medicaid coverage for Georgians. It is beyond dispute that a two-year demonstration will enroll fewer Georgians than a five-year demonstration. That means that tens of thousands of Georgians would be prematurely deprived of health insurance due to the Denial. CMS never even considers this obvious and predictable result of shortening the demonstration and makes no attempt to explain how reinstating the demonstration's initial period would fail to "promote the objectives of the Medicaid program." *See Brooks-LaSure*, 2022 WL 3581859, at *13 ("Because providing health care coverage to needy individuals is the core purpose of Medicaid, the scope of Medicaid coverage is 'an important aspect of the problem,' and the failure to consider it 'alone renders the Agency's decision arbitrary and capricious.'") (internal citations and alterations omitted). Because the Denial would ultimately result in less Medicaid coverage in Georgia and deprive tens of thousands of individuals of potential coverage, it is arbitrary and capricious.

106.    *Second*, CMS' Denial rested on an arbitrary (indeed, brazen) premise: that CMS was not responsible for the loss of Pathways' first three demonstration years. CMS failed to mention its role in delaying Pathways or this Court's decision in its October letter. Likewise, in its December Letter, CMS alleged Pathways had been delayed by nebulous "operational constraints, readiness delays, and/or other factors"—not its own unlawful conduct. December Letter at 1. This assertion ran counter to the evidence before the agency, including its own administrative correspondence with

Georgia (reconsidering and rescinding core aspects of Pathways) and this Court's opinion setting aside CMS' Rescission as unlawful. *Brooks-LaSure*, 2022 WL 3581859, at *23 ("CMS's rescission of the Georgia Pathways demonstration project was not reasoned—it was arbitrary and capricious on numerous, independent grounds."). Because the Denial is based on implausible premises that run counter to the evidence before CMS, it is arbitrary and capricious. *See McElmurray v. U.S. Dep't of Agric.*, 535 F. Supp. 2d 1318, 1324 (S.D. Ga. 2008).

107.    *Third*, the Denial failed to offer any reasoned basis for requiring Georgia to notice, compile, and submit a formal extension request. CMS' initial refusal to consider Georgia's February 2023 Request because it didn't include accompanying reports on data that wouldn't exist until July 2023 is patently unreasonable. So too is CMS' demand that Georgia expend enormous resources compiling a formal extension request—ordinarily based on several *years* of information—with just a few *months* of Pathways data. CMS also fails to explain how Georgia could compile a "historical narrative summary" of Pathways, assess "how [Pathways'] objectives have or have not been met," or submit "[a]n evaluation report" on the demonstration—as required by CMS regulations—when Pathways had only been operational for around 5% of its total lifespan. The illogic of CMS' decision is further underscored by the fact that the sole reason Georgia lacks the data to support a formal extension request is because CMS unlawfully delayed Pathways in the first place. In short, the extension requirements make absolutely no sense in the context of Georgia's request to amend the program period, and therefore CMS' decision to require them is arbitrary and capricious.

108.    *Fourth*, the Denial failed to consider key aspects of the problem raised by Georgia. CMS did not address the fact that without a revised end date, Georgia would be faced with either preparing a burdensome extension request (based on nonexistent data) or preparing a plan to wind down Pathways after it had barely begun. Likewise, CMS ignored the fact that because Pathways was a new program, curtailing it prematurely would likely prevent enrollment from peaking. CMS' failure

to engage with these issues renders its decision arbitrary and capricious. *McElmurray*, 535 F. Supp. 2d at 1324 (an agency's decision may be arbitrary and capricious where it "entirely failed to consider an important aspect of the problem").

109.    *Fifth*, CMS' Denial contradicted its earlier policy, memorialized in the STCs, that Pathways warranted a five-year demonstration period. Ignoring this, CMS' December Letter found that "the current implementation period [of two years] should provide sufficient data to help understand the preliminary aspects of the demonstration." December Letter at 3. Because the Denial "rests upon factual findings that contradict those which underlay its prior policy," CMS was required to provide a "more detailed justification" than the initial finding. *F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515 (2009). But CMS makes no attempt to do so. Indeed, CMS fails to identify any changed facts which justify its complete about-face regarding the demonstration's length. Instead, CMS flatly asserts that a two-year demonstration will accomplish the same thing that a five-year demonstration would. December Letter at 3. Given the fact that the original demonstration period resulted from extensive negotiations, planning, and public rulemaking, and the shortened implementation period resulted from CMS' arbitrary and capricious Rescission, there is a "significant mismatch" between CMS' rationale and the administrative record. *Dep't of Com. v. New York*, 139 S. Ct. 2551, 2575 (2019).

110.    *Sixth*, CMS ignored Georgia's massive and reasonable reliance interests. Georgia expended enormous financial and personnel resources developing and implementing Pathways (twice) in reliance on the STCs' promise of a five-year demonstration period. At the time of CMS' Denial, thousands of Georgians had applied to or enrolled in Pathways, obtaining coverage they couldn't otherwise access.  The State has reasonably relied upon the parties' original bargain to make substantial investments of time, money, and manpower in implementing Georgia Pathways—all of which would be prematurely lost if the project ended just two years after commencing. *See Texas*, 2021 WL 5154219,

at *8 ("In short, given the complex nature of a Medicaid plan, the State's and third parties' reliance on the January final approval was immediate, extensive, and reasonably so."). Because the Denial destroys these reliance interests, CMS was required to provide a "more detailed justification" than the thin procedural fig leaf offered in its October and December letters. *Brooks-LaSure*, 2022 WL 3581859, at *19 (quoting *FCC v. Fox Television Stations*, 556 U.S. 502, 515 (2009)). But far from meeting its duty to thoroughly consider and explain why these reliance interests should be brushed aside, CMS just ignored them. *See id.* at 515 ("[W]hen [the agency's] prior policy has engendered serious reliance interests . . . [i]t would be arbitrary or capricious to ignore such matters."). Moreover, CMS failed to demonstrate that it explored alternatives to denying Georgia's request that could balance its concerns with Georgia's legitimate reliance interests. Ignoring such reliance interests is a hallmark of arbitrary agency action.

111.    *Seventh*, the Denial provides no reasoned basis for requiring that Georgia submit the project's original planned duration period to redundant and burdensome rounds of public notice and comment. In early 2020, the terms of the Pathways demonstration—including the planned five-year period—were submitted to both state and federal notice and comment. Moreover, when CMS approved Pathways in October 2020, it explicitly affirmed the project with "a 5-year period." STC at 1. Requiring Georgia to seek notice and comment for a demonstration term that has already been subjected to notice and comment defies logic and is thus arbitrary and capricious.

112.    *Finally*, the Denial is arbitrary and capricious because its discussion of the parties' STCs serves as mere pretext for achieving its demonstrably obvious goal—terminating or curtailing the Pathways demonstration. Here too, there is a "significant mismatch" between CMS' stated reason for denying the approval—upholding the parties' agreement—and the record, which demonstrates beyond a shadow of a doubt that CMS trampled on the terms of the parties' agreement through its illegal conduct. Courts "cannot ignore the disconnect between the decision made and the explanation

given." *New York*, 139 S. Ct. at 2575. Accepting CMS' flagrantly "contrived reasons would defeat the purpose" of judicial review. *Id.*

## COUNT V
### Violation of the Agreement of January 4, 2021
### (5 U.S.C. §706)

113.    Georgia repeats and incorporates by reference each of the Complaint allegations stated above.

114.    In a letter dated January 4, 2021, CMS reaffirmed its commitment to Georgia Pathways. That letter noted that programs like Georgia Pathways "have proven to be a cornerstone of state innovation from which new best practices can emerge and next generation program design be fostered." CMS Ltr. 1 (Jan. 4, 2021). And the letter further affirmed that "[b]y their nature, section 1115 demonstrations represent a contract between state and federal government." *Id.* Georgia agreed shortly after.

115.    Because agreements between States and CMS in the Section 1115 context are contractual in nature, CMS lacked unilateral authority to constructively amend the bargain by illegally withdrawing program approval and subsequently denying Georgia's request to reinstate the original terms.

**WHEREFORE**, Georgia asks this Court to enter judgment in its favor and to provide the following relief:

a.  Hold unlawful and set aside the Denial;

b.  Issue permanent injunctive relief enjoining Defendants from enforcing the Denial;

c.  Issue declaratory relief declaring that the demonstration's effective end date is September 30, 2028;

d.  All other relief to which Georgia is entitled, including but not limited to attorneys' fees and costs.

Respectfully submitted,

Chris Carr
  *Attorney General of Georgia*
Stephen Petrany
  *Solicitor General*
OFFICE OF THE GEORGIA ATTORNEY
GENERAL
40 Capitol Square SW
Atlanta, GA 30334
(404) 458-3409

Jeffrey M. Harris*
Daniel Shapiro*
Brandon Haase*
  *Special Assistant Attorneys General*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
daniel@consovoymccarthy.com
brandon@consovoymccarthy.com

*pro hac vice motion forthcoming

Dated: February 2, 2024

/s/ Paul M. Scott
Paul M. Scott, Esq. (Ga. Bar No: 140960)
G. Todd Carter, Esq. (Ga. Bar No: 113601)
  *Special Assistant Attorneys General*
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue
P. O. Box 220
Brunswick, GA 31521-0220
Tel:  912-264-8544
Fax: 912-264-9667
pscott@brbcsw.com
tcarter@brbcsw.com