**UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF GEORGIA**
**BRUNSWICK DIVISION**

| | |
|---|---|
| THE STATE OF GEORGIA; GEORGIA DEPARTMENT OF COMMUNITY HEALTH, <br><br>   PLAINTIFFS, <br><br> v. <br><br> CHIQUITA BROOKS-LASURE, in her official capacity as Administrator of the Centers for Medicare and Medicaid Services, et al., <br><br>   DEFENDANTS. | CASE NO. 2:24-cv-16-LGW-BWC |

## REPLY IN SUPPORT OF PLAINTIFFS' MOTION FOR SUMMARY JUDGMENT AND OPPOSITION TO DEFENDANTS' CROSS-MOTION FOR SUMMARY JUDGMENT

Defendants underscore their disregard for this Court's previous opinion by devoting just a single footnote to it. They argue instead that the parties' 2020 agreement operates as a one-way ratchet that allows Defendants to unilaterally dictate and reinterpret its terms at will. By attempting to frame this case as involving Georgia's request to revise the agreement, Defendants obscure the reality that they have *already* significantly shortened the program's duration by breaking the law.

At bottom, Defendants never plausibly explain why Georgia should be forced to bear the consequences of CMS' prior illegal acts. CMS has no authority to require Georgia to undertake a burdensome and potentially futile extension process to implement Pathways for the full term that was approved years ago. Put simply, Georgia should not have to shoulder the burden of CMS' illegality. To ensure that Georgia is not penalized for delays resulting from Defendants' unlawful acts, the Court should set aside CMS' denial of Georgia's request to revise Pathways' effective dates and enter a declaratory judgment that Pathways is to continue for the period CMS originally promised.

**ARGUMENT**

**I.    The Denial is arbitrary, capricious, and contrary to law.**

CMS attempts to frame this suit as an attempt to extend the Pathways demonstration without jumping through the proper regulatory hoops. But Georgia is not seeking to extend the demonstration; it is merely asking CMS to honor the terms of the demonstration it originally agreed to in the STCs. The problem here is not Georgia's lack of diligence, but CMS' refusal to honor its commitment even after being reminded of it by this Court.

**A.    Defendants disregard the importance of this Court's ruling.**

Defendants' disregard for this Court's prior decision is neatly reflected in their decision to limit the entire discussion of *Georgia I* to a *single footnote* (at 21, n.7).[1] In that footnote, Defendants argue that the previous order "did not require CMS to extend the demonstration period beyond its existing date." *Id.* That response represents a profound failure to engage with the reasoning of this Court's decision. The Court did not simply disagree with the Rescission or remand it to the agency for further proceedings; it *vacated* it, finding that it "rested on numerous, profound flaws." *Georgia v. Brooks-LaSure*, No. 2:22-CV-6, 2022 WL 3581859, at *21 (S.D. Ga. Aug. 19, 2022) ("*Georgia I*"). In vacating the Rescission, this Court held that CMS had acted unlawfully by withdrawing the authorities for Pathways and therefore "re-establish[ed] the status quo absent the unlawful agency action." *Florida v. United States*, 660 F. Supp. 3d 1239, 1285 (N.D. Fla. 2023) (citations and subsequent history omitted); *see also Ctr. for Biological Diversity v. Haaland*, No. 23-cv-20495-PAS, 2024 WL 81309, at *1 (S.D. Fla. Jan. 8, 2024) ("[V]acatur returns the parties to the status quo ante ….").

CMS' subsequent refusal to honor that pre-Rescission status quo underscores that CMS effectively seeks to penalize Georgia for CMS' own unlawful actions, which prevented Pathways from

---

[1] All citations in parentheses are to Defendants' Cross-Motion for Summary Judgment, ECF Doc. No. 22, unless otherwise indicated.

launching for several years. Defendants' arguments all proceed on the mistaken assumption that this Court's vacatur of the Rescission is irrelevant to whether Georgia should be allowed to implement the demonstration for the original duration. By proceeding as though this Court's ruling had no bearing whatsoever on the appropriate duration of the demonstration, CMS acted arbitrarily and capriciously.

### B. The Denial failed to consider CMS' responsibility in delaying Pathways.

Astonishingly, Defendants never acknowledge that the sole reason Pathways was delayed by years was their illegal Rescission followed by the need for judicial review. That omission is striking, particularly given this Court's prior decision vacating the Rescission as "rest[ing] on numerous, profound flaws." *Georgia I*, 2022 WL 3581859, at *21. Perhaps recognizing the need to provide *some* explanation for why a demonstration authorized in 2020 did not get underway until 2023, Defendants imply that somebody or something *other* than CMS was responsible for the delay. In fact, every one of CMS' references to "delay" is either in the passive voice or entirely agnostic as to cause:

- "States running demonstration projects 'experience delayed implementation … for various reasons'" (at 10, quoting AR 0013-18);

- "[S]tates routinely implement a demonstration project for a period … 'shorter than the period for which the necessary demonstration authorities are approved'" (at 10, quoting AR 0019);

- "[CMS] 'must consider Georgia's request … notwithstanding any implementation delays the requesting state *may have experienced* with respect to a particular demonstration'" (at 10, quoting AR 0019) (emphasis added);

- "[S]tates running such projects experience delays … '[such that] states may be unable to implement a certain demonstration authority immediately ….'" (at 19) (quoting AR 0019);

- "[U]nexpected complications can arise" (*id.*).[2]

In a variation on this theme, Defendants attempt to equate delays caused *by* CMS with hypothetical delays caused by Georgia or something else. "Georgia's version of program

---

[2] *See also* Defs.' Cross-Mot. at 17 ("[D]elays in implementation are not uncommon"); 18 ("[I]mplementation delays the state may have experienced with respect to a particular demonstration.") (quoting AR 0019).

administration," Defendants protest (at 19), would require CMS to "'pause' a demonstration approval period if, for example, the state's contractors needed to be substituted out, or there was a lapse in state appropriations, or other unforeseen complications arose in the process of implementing or running a demonstration." But Georgia was not asking CMS for deadline relief due to "operational constraints, readiness delays," or any other hypothetical causes they suggest (at 19). Rather, Georgia asked for a revised end date to account for "the significant delay in implementation *caused by* … [CMS'] withdrawn waiver," which resulted in "the loss of Demonstration Years 1, 2, and 3." AR 0002 (emphasis added).

Defendants concede (at 17) that "CMS' response to Georgia's request was not based on the reason for the delay in implementation." In other words, Defendants acknowledge that CMS' responsibility for delaying Pathways was no more than an afterthought in the decision to deny Georgia's request to honor the agreed upon conditions of the demonstration. This ignores an important aspect of the problem—the reason why Georgia submitted its request in the first place—and reflects a clear failure to engage in reasoned decisionmaking. *See Motor Vehicle Mfrs. Ass'n of U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 43, 52 (1983) (agency action is arbitrary and capricious where the agency "entirely failed to consider an important aspect of the problem" or failed to engage in "reasoned decisionmaking"); *Bidi Vapor LLC v. U.S. Food & Drug Admin.*, 47 F.4th 1191, 1202 (11th Cir. 2022); *McElmurray v. U.S. Dep't of Agric.*, 535 F. Supp. 2d 1318, 1324 (S.D. Ga. 2008).

  **C. CMS' framing of Georgia's request as an extension is arbitrary and capricious.**

Defendants attempt to defend the Denial by arguing that Georgia's request to revise Pathways' end date was an extension request subject to the STCs' burdensome formal requirements. That reasoning is flawed and arbitrary on several levels.

*First*, Defendants mischaracterize the nature of Georgia's request, claiming that Georgia asked to lengthen Pathways' overall duration. But as Georgia explained in February 2023, Georgia sought "a full five-year period … [to] assess [Pathways'] effectiveness" in light of "the significant delay in

implementation" caused by the withdrawn waiver, resulting in and "the loss of Demonstration Years 1, 2, and 3." AR 0002. Georgia reiterated this in its November 2023 letter, clarifying that it was not requesting an "'extension' in the classic sense of allowing a demonstration project to last *longer* than its originally authorized term," but "to ensure [it] was able to implement its program for the *originally authorized* five-year term." AR 0013 (emphasis added). In other words, Georgia's request sought to align the demonstration's on-paper dates with the on-the-ground reality in which CMS' unlawful action caused Pathways to launch years behind schedule.

Gliding over this distinction, Defendants ignore the approval letter itself, which provides that Pathways' effective dates may be "extended *or otherwise amended*." AR 0134 (emphasis added). By allowing for an "amend[ment]" to the approval dates, the parties recognized the distinction between changing a particular contractual date ("amend[]") and *increasing* the overall duration of the contract ("extend[]"). CMS' own definition of the word "extension" (at 13) bears this out: while it's possible to "enlarge[]," "increase in length, prolong[] or lengthen[]" the period *between* two dates, there's no way to "enlarge" or "lengthen" an expiration date without reference to something else.

Along these same lines, Defendants assert (at 17) that Georgia should not be "excused" from submitting a formal extension because Georgia effectively "appl[ied] for an extension 18 months before any deadline" and now "complain[s] it has not had sufficient time to collect necessary data." But this entire argument (like the Denial itself) relies on CMS' fundamental mischaracterization that Georgia requested an extension. *See* AR 0006. As noted above, Georgia was clear that it was not applying for an "extension" but seeking to ensure that CMS would honor the original five-year demonstration authorization. Moreover, even on their own terms, Defendants focus on the wrong point in time. The relevant inquiry is whether CMS acted reasonably by denying Georgia's Request for failing to submit data that, *at the time of the request*, did not yet exist. And Defendants' argument conveniently ignores their own role in preventing Pathways from generating the "necessary data."

Defendants assert (at 15, 20) that CMS could not grant Georgia's request because it "must comply with the agency's governing statutes and regulations" and that granting the State's request without a full-blown formal extension application would be "contrary to law." As an initial matter, this argument is simply bootstrapped to the mistaken premise that Georgia asked for an extension in the first place. The State does not dispute that CMS would be powerless to grant an extension lengthening the project "*beyond* the period authorized in these STCs." AR 0030 (emphasis added).

But there is no legal bar preventing CMS from adjusting the effective dates to reflect the period *already* authorized in the STCs. Indeed, the opposite is true—Section 1115 nowhere authorizes CMS to unilaterally shorten an already approved demonstration. *Cf. Forrest Gen. Hosp. v. Azar*, 926 F.3d 221, 233 (5th Cir. 2019) ("Once the Secretary authorizes a demonstration project, no take-backs."). And CMS cannot create new authority for itself by illegally rescinding a demonstration approval, bogging the State down in years of litigation, and then refusing to honor the original length of the demonstration. As Georgia has explained at length, MSJ Br. 22-25, by failing to honor the original terms of the demonstration, CMS is acting without legal authority and directly contrary to law and its agreement with Georgia.[3]

*Second*, Defendants assert (at 16) that "Georgia has not explained why 14 to 20 months of operation is not enough time for it to supply the necessary data and information" to support a formal

---

[3] Defendants' assertion that CMS was *required* to issue the Denial is particularly untenable in light of this Court's previous holding that the Recission conflicted with the text and purpose of the Social Security Act because it would likely result in a reduction of coverage. *Georgia I*, 2022 WL 3581859, at *1 ("CMS, in short, failed to consider or weigh the possibility that rescinding Pathways would mean less Medicaid coverage in Georgia."). The same is true here. "This is straightforward arithmetic: the 2-year program CMS seeks to impose will result in less Medicaid coverage than the 5-year program agreed to in the initial Approval, both in terms of the number of individuals enrolled and the duration of their coverage." MSJ Br. at 24. Defendants nowhere dispute that the Denial may ultimately result in less coverage or explain how the Denial accords with the Social Security Act. *Cf. Georgia I*, 2022 WL 3581859, at *13 ("Because providing health care coverage to needy individuals is the core purpose of Medicaid, the scope of Medicaid coverage is an important aspect of the problem, and the failure to consider it alone renders [the Agency's] decision arbitrary and capricious." (internal quotation marks and citations omitted)).

extension. But Georgia explained to the agency precisely why a truncated demonstration was insufficient to collect the data it needs. Georgia outlined this in detail in its February 2023 letter, explaining that at least two years of data are necessary to accurately assess whether Pathways is accomplishing its goals, because there is no other comparable program against which to measure Pathways' progress. AR 0003. Because "no true comparison for [the Pathways] population exists," "Demonstration Year 1" is only "the baseline" that allows for "a comparison of demonstration years 2-5." *Id.* Year 1 itself provides no data that has stand-alone relevance—it is only useful in comparison with the other years of the demonstration. Georgia also explained that because Pathways "is a new program and members must 'opt in' … it will take time for enrollment to peak and to collect and analyze a sufficient amount of data for the baseline calculations." *Id.* And Georgia reiterated these and other arguments in its November 16, 2023 letter requesting reconsideration. AR 0015–18.

Rather than address these points, Defendants simply repeat (at 16) CMS' prior assertion that it "'believes that the current implementation period … should provide sufficient data to help understand the preliminary effects of the demonstration.'" Defendants' only support for this is to note (at 16) that "CMS has approved demonstration projects for as short as three years," which require a State to "seek an extension six to twelve months before the demonstration authorities expire." But Defendants don't explain how a *different* demonstration approved for a *three-year* period time tells us anything about the needs of the Pathways demonstration, which was specifically designed to test unique hypotheses over a *five-year* period. Moreover, for such a three-year demonstration to represent a true comparison for Pathways, the hypothetical state would be prevented from implementing the demonstration for the first 18 months—resulting in an extension request based on just *four months* of data. Unsurprisingly, CMS makes no such suggestion. And, regardless of whether a three-year determination is "sufficient," that is not what Georgia agreed to (and CMS approved) in the STCs.

*Third*, Defendants cannot overcome the agreement's clear terms, which unequivocally establish

a five-year duration for Pathways. CMS argues (at 19) that the approval period is something other than five years because "[t]he date range specified [October 15, 2020 – September 30, 2025] is itself less than five years." But the demonstration is premised on 5 distinct periods, each consisting of roughly a year—"Demonstration Year 1," "Demonstration Year 2," "Demonstration Year 3," "Demonstration Year 4," and "Demonstration Year 5." It is irrelevant that "Demonstration Year 5," is a few days shy of a full year—it is still a distinct period in which to test the demonstration's hypotheses that was expressly contemplated by the STCs. And the STCs expressly refer to the length of Demonstration Year 5 as "12 months." AR 0054. To the extent CMS is claiming the parties agreed to an approval period amounting to "five years, give or take fifteen days," there is no dispute. But that's not CMS' argument—rather, CMS argues (at 16) that this fifteen-day difference somehow supports reducing "a 5-year period," consisting of five distinct timeframes, to a single "14 to 20 month[]" period.[4] That assertion is arbitrary and untenable.

So too is Defendants' suggestion (at 19) that Pathways' "maximum duration" is only "four years and three months" because the parties contemplated that the demonstration would not be implemented until July 1, 2021. This displays a willful blindness about the nature of demonstration projects administered by CMS. The simple fact is that Georgia had to expend vast effort on Pathways *before* the implementation date just to get the project off the ground, which is why the STCs specifically provided for "a 5-year period," composed of 5 separate "12 month" "Demonstration Years" starting October 15, 2020, STC 57—not a "4.25-year period" starting July 1, 2021. It's also worth noting that these preliminary efforts, which Georgia expended in reliance on the approval, were largely wasted because of the Rescission. Defendants continue to minimize and ignore Georgia's "work[] to

---

[4] This also breaks down a fundamental part of the STCs—measurement of results over discrete "Demonstration Years." *E.g.*, AR 0054 (STC 57). Under Defendants' proposal, there are no discrete "Demonstration Years," in which to make discrete, year-by-year measurements that can be compared against other Demonstration Years, and there are certainly not five such periods.

- 8 -

implement [the] demonstration project … in reliance on the Agency's good word." *Georgia I*, 2022 WL 3581859, at *18.

Defendants also mischaracterize (at 18-21) the significance of the effective dates by stripping them out of context. Neither the approval nor the STCs say that "Pathways … is approved [*until*] September 30, 2025," full stop. Instead, every reference to the demonstration's end date (September 30, 2025) follows the demonstration's start date (October 15, 2020) that is, not coincidentally, five years earlier. AR 0025, 0027, 0134. The STCs make this explicit, describing the approval period as "a 5-year period"—a phrase CMS reads right out of the agreement. AR 0027. Likewise, as noted above, the STCs expressly contemplate five distinct "demonstration years," not a singular "approval period" bounded by an expiration date. AR 0054. An extension, moreover, involves a request to extend "beyond the *period* provided for in these STCs," not to revise contractual dates to account for one party's unilateral, unlawful delays. AR 0030 (emphasis added).

Defendants (at 18) ignore these provisions, instead simply pointing to the September 30, 2025 expiration date as sufficient. But Defendants never explain why the only date that counts when calculating the approval period is the end date. Worse, Defendants' interpretation treats the effective dates as a one-way ratchet that allows CMS to illegally delay a demonstration's *start* date for years without consequences but requires Georgia to strictly comply with the original *end* date by pursuing termination or a costly extension. That interpretation is arbitrary on its own terms and defies the parties' original expectations, which clearly specify a five-year demonstration project.

*Fourth*, Defendants contend (at 20) that CMS "has not shortened the approval period" and that it "continues to run from October 15, 2020 to September 30, 2025." To the contrary, Pathways was approved in October 2020 but, within just a few months of the approval, CMS threatened to withdraw its approval for key components because it "preliminarily determined" they were not in accordance with the goals of the Social Security Act. CMS later formalized that withdrawal in the

- 9 -

Rescission. It was not until August 2022, when this Court ordered CMS to reinstate its original approval, that Georgia could legally operate Pathways as originally designed. CMS' unlawful conduct thus *de facto* amended Pathways' original start date to a much later date.

Defendants never explain how Georgia could simultaneously have approval and non-approval to operate Pathways. The only way to make such 'phantom approval' work is to assume what this Court explicitly rejected in its prior decision: that "Georgia would agree to implement Pathways *without the pathways*." *Georgia I*, 2022 WL 3581859, at *12. With that argument off the table, Defendants are left to assert that, despite CMS' termination of the authorities central to Pathways, Georgia was free to implement Pathways without interruption beginning on October 15, 2020. That is the definition of unreasoned.

*Fifth*, Defendants' interpretation of the agreement conflicts with its prior policy. CMS' original decision to approve Pathways for a particular duration—not simply until a particular date—flows from the language of Section 1115, which provides that the Secretary may authorize demonstrations "for the *period* he finds necessary to enable such State or States to carry out such project." *Id.* (emphasis added). When CMS approved Pathways in 2020, it determined that Georgia needed five years to implement and evaluate it. CMS has never explained why that determination was wrong, nor why this Court should not hold CMS to it. *See F.C.C. v. Fox Television Stations, Inc.*, 556 U.S. 502, 515–16 (2009) (explaining that where an agency action "rests upon factual findings that contradict those which underlay its prior policy," it is required to provide a "more detailed justification").

**D.     CMS arbitrarily disregards the consequences of its Denial for Georgia.**

CMS' unlawful conduct has resulted in significant negative consequences for Georgia and its citizens. In 2020 and early 2021, Georgia expended considerable resources in anticipation of starting Pathways, only to see those efforts wasted by CMS' unlawful Rescission. *See Georgia I*, 2022 WL 3581859, at *17–18. Georgia has now spent over three years seeking to implement the program CMS

promised in 2020, unlawfully revoked in 2021, and now attempts to unlawfully amend. CMS now demands that Georgia expend yet more resources compiling a formal extension request that, but for CMS' unlawful conduct, Georgia would not need to file for several years.

Defendants' lengthy recitation (at 3-5, 14-15) of the requirements for an extension of the program term only underscores the extensive regulatory burdens CMS seeks to impose. First, Georgia must go through state-level notice and comment, providing "a 'comprehensive description' of the 'extension to be submitted to CMS,' including information specified in the regulations such as [an] 'estimate of the expected increase or decrease in annual enrollment, and in annual aggregate expenditures,'" and "[t]he hypothesis and evaluation parameters of the demonstration." *See* 42 C.F.R. §431.408.

Georgia must then compile an application consisting of "seven enumerated documents" (at 4, 14) which must be submitted to CMS, including:

> (i) A historical narrative summary of the demonstration project, which includes the objectives set forth at the time the demonstration was approved, evidence of how these objectives have or have not been met, and the future goals of the program.
>
> (ii) If changes are requested, a narrative of the changes being requested along with the objective of the change and the desired outcomes.
>
> (iii) A list and programmatic description of the waivers and expenditure authorities that are being requested for the extension period, or a statement that the State is requesting the same waiver and expenditure authorities as those approved in the current demonstration.
>
> (iv) Summaries of External Quality Review Organization (EQRO) reports, managed care organization (MCO) and State quality assurance monitoring, and any other documentation of the quality of and access to care provided under the demonstration, such as the CMS Form 416 EPSDT/CHIP report.
>
> (v) Financial data demonstrating the State's historical and projected expenditures for the requested period of the extension, as well as cumulatively over the lifetime of the demonstration. This includes a financial analysis of changes to the demonstration requested by the State.
>
> (vi) An evaluation report of the demonstration, inclusive of evaluation activities and findings to date, plans for evaluation activities during the extension period, and if changes are requested, identification of research hypotheses related to the changes and an evaluation

 design for addressing the proposed revisions.

 (vii) Documentation of the State's compliance with the public notice process set forth in § 431.408 of this subpart, including the post-award public input process described in § 431.420(c) of this subpart, with a report of the issues raised by the public during the comment period and how the State considered the comments when developing the demonstration extension application.

42 C.F.R §431.412(c)(2). Even after conducting the necessary research and preparing and submitting these documents, Georgia must then undergo *another* round of federal notice and comment, which may result in further alterations to the demonstration. 42 C.F.R. §431.416 (b)(i)-(iv).[5]

 In short, requiring Georgia to submit a formal extension request is no small matter. Such a request is a huge regulatory undertaking, requiring Georgia to expend considerable amounts of money, time, and staff resources. And, worse, even if Georgia pursues a formal extension, there is no guarantee CMS would grant it, especially given that it would be based on data that CMS can claim to be incomplete because of the truncated demonstration period. And based on CMS's prior withdrawal of key program terms and refusal to allow Georgia to operate the program for its full authorized term, Georgia is justifiably skeptical of how CMS would evaluate a formal extension application.

 Defendants dismiss Georgia's concerns, claiming (at 22) that "there is nothing novel" about this predicament and that "[i]t is contemplated by" the STCs' requirement that Georgia "must submit an application to CMS" if it "intend[s] to request an extension." But Georgia's situation is clearly different: there is no STC providing for what to do if CMS unlawfully prevents Georgia from starting the demonstration for several years. Moreover, the STCs and associated regulations contemplate that an extension of the program period need not be filed until, at the earliest, a year before the demonstration's expiration date—i.e., Demonstration Year 4. But here, Georgia would be forced to

---

[5] It would be especially pointless to require additional notice and comment to restore Pathways' original term given that the original authorization, which provided for a five-year term, already went through two rounds of notice and comment, at both the state and federal levels. *See* AR 0144–0145.

file the extension in Demonstration Year 2, well ahead of schedule and based on far less data.[6]

Defendants (at 22) repeat CMS' prior assertion that Georgia "has plenty of time … to meet the regulatory requirements to request an extension." CMS never offered any reasonable explanation to support this conclusion, and it is therefore not entitled to deference. *Texas v. Brooks-LaSure*, No. 6:21-CV-00191, 2021 WL 5154219, at *11 (E.D. Tex. Aug. 20, 2021) ("Courts 'do not defer to the agency's conclusory or unsupported suppositions.'") (citation omitted). In all events, even if Georgia technically *could* meet the requirements for a formal extension, this hardly shows that it is *required* to do so.

Defendants state (at 2) that "CMS cannot evaluate … an extension request" that does not go through two rounds of notice and comment accompanied by substantial supporting documentation. But, again, a five-year program period has already undergone two rounds of notice and comment and been approved by CMS. *See* AR 0144–0145. Claiming that Georgia can still submit a formal extension misses the essence of Georgia's argument: requiring the State to perform such a considerable undertaking is unwarranted by the facts, not required by law, not required by the STCs, and arbitrary and capricious.

Contrary to CMS' argument (at 21-22), Georgia has not argued that CMS' Denial was a substantive decision on the merits of an extension. Rather, the Denial conclusively determined that Georgia must submit a burdensome extension request to preserve even the possibility of restoring the original program period, or else submit a plan to wind down Pathways. The Denial definitively rejected Georgia's request to reinstate the demonstration's original duration absent a burdensome extension request. *See Alabama v. Ctrs. for Medicare & Medicaid Servs.*, 780 F. Supp. 2d 1219, 1227–28 (M.D. Ala.

---

[6] An extension request in Demonstration Year 2 would also misrepresent Pathways' progress by including just three months of data on an entire additional phase of the demonstration, which is not slated to go into effect until July 1, 2024. *See* AR 0571 (setting the implementation date for Pathways' "premium or account payments" for July 1, 2024); *see also id.* 0581 ("The State anticipates a Phase 3 implementation date of July 1, 2024").

2011), *aff'd*, 674 F.3d 1241 (11th Cir. 2012) (finding a pre-enforcement policy letter constituted final agency action as "one from which 'legal consequences *will* flow'") (citation omitted). And it also determined Georgia's rights under the agreement by reducing the demonstration by several years and eliminating several Demonstration Years altogether. *See id.*; *cf. Texas*, 2021 WL 5154219, at *5. That final agency action was arbitrary and capricious, and results in immediate consequences warranting this Court's intervention.

II.     **This Court is empowered to make Georgia whole for CMS' unlawful actions.**

    A.     **Vacatur of the Denial on the grounds Georgia requests would provide complete relief.**

Defendants argue that even if this Court holds the Denial unlawful and vacates it, Pathways would still expire on September 30, 2025. In other words, CMS believes that even if this Court finds that the agency acted unlawfully, CMS may still enforce that erroneous interpretation against Georgia. This theory contravenes basic principles of administrative law. The APA empowers Courts to "hold unlawful and set aside agency action, findings, and conclusions found to be … arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law." 5 U.S.C. §706.

On finding an agency acted unlawfully, the Court is empowered to fashion an order placing the wronged party "in the situation he would have been in had [the agency] not acted improperly." *Getty v. Fed. Sav. & Loan Ins. Corp.*, 805 F.2d 1050, 1061 (D.C. Cir. 1986); *see also Weingarten v. Devos*, 468 F. Supp. 3d 322, 336 (D.D.C. 2020) ("[A]s the Department concedes, the Court at least can vacate an arbitrary and capricious decision, declare the action unlawful, and remand to the agency for further proceedings consistent with the APA and the Court's ruling."); *and Reyes-Hoyes v. Garland*, No. 20-60133, 2023 WL 3075064, at *9 (5th Cir. Apr. 25, 2023) (citations omitted). ("[W]here an agency has failed to comply with its responsibilities, [the court] should insist on its compliance rather than attempt to supplement its efforts."). This authority is captured in the familiar formula in which a court orders that the agency action is "vacate[d] under the APA[] and … remanded to [to the agency] for further

proceedings consistent with this Opinion and Order." *E.g.*, *Florida*, 660 F. Supp. 3d at 1285.

Here, the "agency action, findings, and conclusions" supporting CMS' Denial are its determinations (A) that Pathways' duration is *not* five years; (B) that Pathways must end on September 30, 2025; and (C) that Pathways' effective dates cannot be revised absent a formal extension application. Accordingly, if the Court were to "hold unlawful and set aside" these determinations, it would be finding that Pathways' duration *is* five years, that Pathways end date is *not* September 30, 2025, and that a formal extension is *not* required to revise Pathways' effective dates. On remand, CMS would be bound to act "consistent with" this Court's order and would not be entitled to simply enforce its erroneous understanding of the parties' agreement against Georgia. Georgia therefore requests that this Court vacate and set aside the Denial in its entirety and remand with instructions making clear that Georgia's authorization runs until September 30, 2028.

**B.     The APA authorizes declaratory and injunctive relief, and courts regularly provide such relief.**

Defendants argue (at 23) that "under settled principles of administrative law," declaratory and injunctive relief are unavailable. But the APA expressly authorizes both forms of relief. Section 703 provides that in the absence of a "special statutory review proceeding" governing a particular administrative claim, a party may pursue "any applicable form of legal action, *including actions for declaratory judgments* or … *mandatory injunction* … in a court of competent jurisdiction." 5 U.S.C. §703 (emphasis added); *cf. Clayton Cnty., Georgia v. Fed. Aviation Admin.*, 887 F.3d 1262, 1270 (11th Cir. 2018) (explaining that a final agency action may be challenged under 5 U.S.C. §703); 33 Fed. Prac. & Proc. Judicial Review §8385 (2d ed.) ("Modern administrative law offers plaintiffs several different paths to seeking injunctive relief (or its less coercive cousin, declaratory judgment).").

***Injunctive Relief***. The Eleventh Circuit has held that "[a]bsent the clearest command to the contrary from Congress, federal courts retain their equitable power to issue injunctions in suits over which they have jurisdiction." *Alabama-Tombigbee Rivers Coal. v. Dep't of Interior*, 26 F.3d 1103, 1107

(11th Cir. 1994); *cf. Curry v. Block*, 738 F.2d 1556, 1563-64 (11th Cir. 1984) (affirming district court's grant of injunctive relief in APA suit). Such relief is particularly warranted when there is no "alternative remedy" that "provide[s] the 'same genre of relief,'" such as where in the absence of a favorable decision "the State may not recover compliance costs" due to the federal government's enjoyment of sovereign immunity." *Texas v. Brooks-LaSure*, 680 F. Supp. 3d 791, 806 (E.D. Tex. 2023); *see also Wages & White Lion Invs., L.L.C. v. United States Food & Drug Admin.*, 16 F.4th 1130, 1142 (5th Cir. 2021) ("Indeed, complying with [an agency order] later held invalid almost always produces the irreparable harm of nonrecoverable compliance costs.") (quotation omitted).

The Eleventh Circuit's analysis in *Alabama-Tombigbee Rivers Coalition* is instructive. 26 F.3d 1103. There, private actors sued the Department of Interior to prevent it from publishing a report on an endangered species that had been assembled in violation of the procedural requirements imposed by the Federal Advisory Committee Act, and the district court permanently enjoined the agency from publishing, using, or relying on the report. *Id.* at 1105. The Eleventh Circuit affirmed, explaining that the federal courts' injunctive power "necessarily encompasses the ability to fashion equitable relief in order to 'adjust and reconcile public and private needs.'" *Id.* at 1107 (citations omitted). It further held that "injunctive relief [was] the only vehicle that carries the sufficient remedial effect to ensure future compliance" with the law and that "[a]nything less would be tantamount to nothing." *Id.*

Here, Georgia requests that this Court enjoin CMS from enforcing the Denial—*i.e.*, from requiring Georgia to either submit a formal extension request or else submit a plan to terminate Pathways ahead of September 30, 2025. Given that this is the second time Georgia has been forced to seek judicial intervention to vindicate its right to operate the Pathways demonstration as originally promised, an injunction ensures that CMS cannot ignore this Court's order again on remand, thereby requiring Georgia to absorb additional compliance and litigation costs.

***Declaratory Relief***. "A declaratory judgment states the existing legal rights in a controversy,

but does not, in itself, coerce any party or enjoin any future action." *Ulstein Mar., Ltd. v. United States*, 833 F.2d 1052, 1055 (1st Cir. 1987). As such, "a declaratory judgment is a milder remedy which is frequently available in situations where an injunction is unavailable…." *Id.*; *see also Green v. Mansour*, 474 U.S. 64, 72 (1985) (observing, in a suit brought under the APA, "declaratory relief may be available even though an injunction is not"); *cf. Sackett v. E.P.A.*, 566 U.S. 120, 125 (2012) (involving claims for declaratory and injunctive relief under the APA). Such relief is available so long as there is no "special statutory review proceeding" governing the claim at issue. 5 U.S.C. §703.

Defendants' cited precedents (at 23) are inapposite. The holdings of Defendants' first two cases merely establish that the scope of judicial review is limited to determining whether the agency acted *legally*—*i.e.,* whether it acted arbitrarily, capriciously, or contrary to law. *See PPG Indus., Inc. v. United States*, 746 F.3d 1102 (D.C. Cir. 2014); *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744 (1985). That limitation has no relevance to this Court's ability to fashion *relief* authorized under the APA. *See* 5 U.S.C. §§702, 703, 706. And the decision in *Gallo v. Amoco Corporation* did not involve review under the APA at all—in fact, the appeals court explicitly faulted the district judge for treating the defendant "*as if* [*he*] *were* an administrative agency." 102 F.3d 918, 920 (7th Cir. 1996) (emphasis added).

Defendants further cite *Palisades Gen. Hosp. Inc. v. Leavitt* for the proposition that this Court lacks "jurisdiction to order specific relief" here. 426 F.3d 400, 404 (D.C. Cir. 2005). But in *Palisades*, the court found that a specific provision in the Medicare Act expressly "barr[ed] the … relief requested." *Id.* Defendants identify no such prohibition here. Defendants' reliance on *Allina Health Services v. Sebelius* is similarly misplaced because, there, the district court order under review "went further" than determining the legality of the specific agency action in dispute and held the agency could not reach a different conclusion in a future proceeding. 746 F.3d 1102, 1111 (D.C. Cir. 2014). Likewise, *Sec. & Exch. Comm'n v. Chenery Corporation* simply stands for the proposition that an agency may sometimes create policy through adjudication, which is not at issue here. 332 U.S. 194, 203 (1947).

Defendants assert (at 24) that this Court "lacks authority under the APA to declare a new end date for Pathways." But if the Court is considering remedies, this means it has already found that CMS acted arbitrarily and unlawfully by refusing to honor the original time periods set out in the STCs. In any event, Georgia is asking this Court to hold that parties' agreement allows Georgia to operate Pathways for a full five-year period until September 30, 2028. Granting the request would provide relief to Georgia by enabling it to implement and evaluate Pathways as originally designed and to submit an extension request after gathering sufficient data. Declaratory relief would also provide a remedy for CMS' unlawful Rescission and the resulting delays. And while injunctive relief is warranted here (*see supra*), should this Court find otherwise, it can still issue declaratory relief. Such relief would minimally interfere with CMS' functions by simply requiring the agency to allow Georgia to operate Pathways for the same term CMS originally approved.

## CONCLUSION

For these reasons, the Court should deny Defendants' cross-motion for summary judgment, grant Georgia's Motion for Summary Judgment, and provide the following relief:

a. Hold unlawful and set aside the Denial;

b. Issue permanent injunctive relief enjoining Defendants from enforcing the Denial;

c. Issue declaratory relief declaring that Pathways' effective end date is September 30, 2028;

d. All other relief to which plaintiffs are entitled, including *inter alia* attorneys' fees and costs.

Dated: May 20, 2024

Chris Carr
  *Attorney General of Georgia*
Stephen Petrany
  *Solicitor General*
40 Capitol Square SW
Atlanta, GA 30334
(404) 458-3409

Paul M. Scott, Esq. (Ga. Bar No: 140960)
G. Todd Carter, Esq. (Ga. Bar No: 113601)
  *Special Assistant Attorneys General*
BROWN, READDICK, BUMGARTNER,
CARTER, STRICKLAND & WATKINS, LLP
5 Glynn Avenue, P. O. Box 220
Brunswick, GA 31521-0220
Tel: 912-264-8544
pscott@brbcsw.com
tcarter@brbcsw.com

Respectfully submitted,

/s/ *Jeffrey M. Harris*
Jeffrey M. Harris*
Daniel Shapiro*
Brandon Haase*
  *Special Assistant Attorneys General*
CONSOVOY MCCARTHY PLLC
1600 Wilson Blvd., Ste. 700
Arlington, VA 22209
(703) 243-9423
jeff@consovoymccarthy.com
daniel@consovoymccarthy.com
brandon@consovoymccarthy.com

* admitted *pro hac vice*

- 20 -

## CERTIFICATE OF SERVICE

I hereby certify that this motion was electronically filed with the Clerk of Court using the CM/ECF system on May 20, 2024, thereby serving all counsel of record.

/s/ *Brandon Haase*
Brandon Haase (admitted *pro hac vice*)
*Counsel for Plaintiffs*