UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF GEORGIA
BRUNSWICK DIVISION

| | |
|---|---|
| **THE STATE OF GEORGIA, et al.** )<br><br>   **Plaintiffs,** )<br><br>   v. )<br><br>**CHIQUITA BROOKS-LASURE** in her official capacity as Administrator of the Centers for Medicare and Medicaid Services; et al.<br><br>   **Defendants.** ) | )<br>)<br>)<br>)<br>)<br>)<br>)  Case No. 2:24-cv-16-LGW-BWC<br>)<br>)<br>)<br>)<br>)<br>)<br>) |

**DEFENDANTS' REPLY IN SUPPORT OF
CROSS-MOTION FOR SUMMARY JUDGMENT**

**INTRODUCTION**

Georgia Pathways to Coverage ("Pathways"), a cooperative federal-state endeavor to provide health care to certain low-income Georgians, has been in effect since July 2023. Plaintiff State of Georgia now seeks to extend the duration of this project beyond the end date specified when the project was approved. Federal law sets forth explicit application and notice requirements for extension requests. Defendant Centers for Medicare & Medicaid Services ("CMS") routinely handles extension requests for demonstration projects and works collaboratively with states to review data and revise program implementation as appropriate. But Georgia refuses even to apply for an extension of Pathways. Instead, Georgia asks this Court to create an ad hoc exception to the applicable regulations, which authorize no such thing. Because this Court lacks authority to exempt Georgia (or CMS) from federal law, the Court should decline Georgia's invitation.

Georgia's assertion that CMS has violated this Court's Order in *Georgia v. Brooks-LaSure,* No. 2:22-CV-6 (S.D. Ga., August 19, 2022) is meritless. The Court's Order in that case "set aside" CMS's recission of approval for two components of Pathways, and, consistent with that order, CMS has

1

permitted Georgia to fully implement Pathways. The Court's prior order did not require CMS to extend the demonstration period beyond its existing end date of September 30, 2025 or require CMS to ignore the special terms and conditions (STCs), statutes, and regulations governing what is required for a state to submit a proper extension request.

**I. BECAUSE GEORGIA SEEKS AN EXTENSION BUT HAS NOT APPLIED FOR ONE, THE CMS DECISION CHALLENGED HERE IS LAWFUL.**

Georgia Pathways is authorized until September 30, 2025. Without an extension, the expenditure authority will expire on that date. Georgia seeks to run Pathways beyond September 30, 2025, claiming that this request is not an extension in the "classic sense" of the word. *See* Reply in Supp. of Pls.' Mot. for Summ. J. & Opp'n to Defs.' Cross-Mot. for Summ. J., ECF No. 24 at 5 ("Pls.' Opp."). And, Georgia says, in any event, it should not be required to submit an application to seek this extension. This Court should reject both arguments.

**A. The Documents that Govern Pathways Permit Only Amendments or Extensions; Georgia Has Not Applied for Either.**

The STCs detail two categories of changes to Pathways that Georgia could request: an amendment or an extension.

1. <u>Amendments</u>. The amendment process is outlined in STC 6, which is entitled "Changes Subject to the Amendment Process." That paragraph provides: "Changes related to eligibility, enrollment, benefits, beneficiary rights, delivery systems, cost sharing, sources of non-federal share of funding, budget neutrality, and other comparable program elements must be submitted to CMS as amendments to the demonstration." AR 0029. STC 7, entitled "Amendment Process" then describes how Georgia could seek an amendment, and itemizes the information that "must" be included with the state's request so CMS can evaluate the application. AR 0030.

Georgia suggests that its request to extend the end date of Pathways could be viewed as an amendment. *See* Pls.' Opp. at 5. Georgia, however, does not explain how extending Pathways' effective

date past September 30, 2025 is plausibly any of the "changes subject to the amendment process" listed in STC 6. The final clause of STC 6—"and other comparable program elements"—includes only changes that are similar to those previously listed, and the effective dates of Pathways is not such a "comparable program element[]." *Compare generally, Norfolk & W. Ry. Co. v. Am. Train Dispatchers' Ass'n*, 499 U.S. 117, 129 (1991) ("Under the principle of ejusdem generis, when a general term follows a specific one, the general term should be understood as a reference to subjects akin to the one with specific enumeration").

In any event, Georgia has never submitted to CMS an application to amend Pathways that meets the requirements of STC 7. Nor does Georgia argue that it *has* submitted a proper amendment request. Thus, even if the Court concludes that Georgia's request to extend the end date of the demonstration was an amendment instead of an extension, CMS's determination should be upheld. AR 0006-07; 0019-21 (both CMS's Oct. and Dec. 2023 letters).

2. <u>Extensions</u>. Had Georgia properly made an extension request, that request would be governed by STC 8, entitled "Extension of the Demonstration." This paragraph explains: "States that intend to request an extension of the demonstration must submit an application to CMS from the Governor or Chief Executive Officer of the state in accordance with the requirements of [42 C.F.R. § 431.412(c)]." AR 0030. This regulation, as CMS explained in its opening memorandum, also itemizes specific information required from the state before CMS may consider an extension application. *See* Defs.' Mem. in Opp'n to Pls.' Mot. for Summ. J. & in Supp. of Defs.' Cross-Mot. for Summ. J., ECF No. 21 at 4. ("Defs.' Mem."). CMS asks for this information to make informed decisions about demonstration extension applications, and to ensure "information about Medicaid . . . demonstration applications and approved demonstration projects is publicly available" and to "promote greater transparency in the review and approval of demonstrations." Medicaid Program; Review and Approval Process for Section 1115 Demonstrations, 77 Fed. Reg. 11,678 (Feb 27, 2012).

Georgia does not argue that CMS erred in denying any proper extension request, because Georgia did not submit one. Georgia instead seeks an exemption from complying with the application and notice requirements in the STCs and 42 C.F.R §§ 431.408(a) and 431.412(c) because, in its view, those requirements would be too burdensome for the state. Pls.' Opp. at 12. But the STCs and federal regulations do not permit an exemption in these circumstances. And Georgia does not argue otherwise. Indeed, Georgia concedes, as it must, that, absent an extension request that complies with the statute and applicable regulations, CMS is "powerless to grant an extension lengthening the project 'beyond the period authorized in these STCs.'" *Id.* at 6 (quoting AR 0030). This alone resolves this case: the STCs and federal law permit CMS to extend a demonstration project only upon consideration of a state's application and completion of the relevant notice-and-comment processes. 42 C.F.R. §§ 431.408, 431.412. Because Georgia did not submit the materials required by the STCs and applicable regulations for an extension request, CMS properly responded to Georgia's request and this Court should uphold that decision. *See, e.g.*, *Bean v. Purdue*, 316 F. Supp. 3d 220, 227 (D.D.C. 2018) ("[A]dministrative decisions made in accordance with applicable statutes and regulations are not arbitrary and capricious."); Defs.' Mem. at 15 (citing additional cases).

CMS awaits Georgia's application package to consider extending Pathways. If and when Georgia applies for an extension, CMS will take into account that Pathways has only been operational since July 2023. *See* AR 0019-21. And if Georgia applies on the timeline envisioned by the applicable regulations—six to twelve months before the current expiration date, *see* 42 C.F.R. § 431.412(c)— Georgia should have the data and information necessary to complete the application. Unless and until Georgia applies, however, CMS (and this Court) are indeed "powerless to grant an extension." Pls.' Opp. at 6.

4

B.  **Under the Explicit Terms of its Authorization, Pathways Expires on September 30, 2025.**

Georgia argues that Pathways was not authorized for a *specific* period between October 2020 and September 2025—but rather that Georgia was authorized to run Pathways during *any period* of time until the project had been fully operational for a full five years. Pls.' Opp. at 5. This argument contravenes both the plain terms of the approval documents and common sense.

CMS's approval letter, the Expenditure Authorities, and the STCs are all clear that Pathways is not authorized for a period of years; rather, Georgia has authority to run a demonstration project between the dates specified. *See* AR 0134 (CMS approval letter) ("This approval is effective October 15, 2020, through September 30, 2025, *upon which date*, . . . all authorities . . . will expire." (emphasis added)); AR 0156 (Expenditure Authority) ("expenditures made by Georgia for the items identified [in the document] . . . shall, for the period from October 15, 2020 – September 30, 2025, unless otherwise specified, be regarded as expenditures under the state's title XIX plan"); AR 0158 (STCs) ("The Georgia Pathways to Coverage demonstration . . . is approved for a 5-year period from October 15, 2020 – September 30, 2025."). The STCs and the Expenditure Authorities both set July 1, 2021 as the date Georgia expected to implement Pathways, leaving October 2020 to July 2021 as time for the state to prepare to run the program. *See* AR 0147 (Approval Letter) ("Although CMS is approving the Georgia Pathways to Coverage demonstration today, the state does not plan to implement until July 1, 2021."). Therefore, from the beginning, CMS approved Pathways to run for a maximum of four years and three months, expiring on September 30, 2025.

If CMS intended to give Georgia permission to operate Pathways for a full five years, regardless of end date, the approval documents would have been written differently. Delays in demonstration projects are not uncommon, as CMS explained to Georgia. AR 0019; *see* Defs.' Mem. at 10, 17. Thus, if Pathways were authorized for some number of years, the STCs would have contained provisions or a formula addressing how those years are counted and how to determine

5

when time has elapsed when unexpected complications caused a pause or delay of Pathways. Or the STCs would have explained how to determine whether any specific day, week, or month "counted" for the purposes of accruing time. But none of the approval documents imagines any such "pause" button. To the contrary, both documents make clear that if Georgia does not apply for and receive an extension, Pathways will expire on September 30, 2025. AR 0134.

Georgia's claim about the duration of the approval is likewise inconsistent with CMS's practice. No demonstration project is authorized for a period of years, regardless of end date—and neither was Pathways. Nor does CMS require that the data generated by any demonstration project be fully synthesized before a state applies for an extension. In fact, STCs generally require that states submit reports 18 months after a demonstration period has ended, because the data necessary to fully evaluate that project may not be available on the expiration date. 77 Fed. Reg. 11,689. *See* AR 0180-81 (STC 76, "Summative Evaluation Report"). Similarly, 42 C.F.R. § 431.412(c) does not require the state to have accumulated all the data the project will eventually yield to justify an extension.

Furthermore, Georgia's actions here confirm that it also understood the approval for Pathways would expire on September 30, 2025 absent an extension. If Pathways was authorized for a period of years, regardless of end date, the state would not have requested to extend (or amend) the end date—AR 0001-05; AR 0013-18—nor would it be requesting judicial intervention on an expedited basis to ensure the state may timely apply for an extension if its request for relief in this case is denied. *See* Joint. Mot. for Entry of a Briefing Schedule, for a Stay of Other Case Deadlines & to Expedite Decision, ECF No. 16, ¶ 6.

Georgia asserts that it seeks to run Pathways "as originally promised." Pls.' Opp. at 16. But the current end date for Pathways is exactly the same as when the project was originally approved—namely, September 30, 2025. What Georgia actually seeks is judicial intervention to run Pathways *beyond* September 30, 2025, without completing the application and notice requirements mandated by

6

federal law to extend the program. Not surprisingly, Georgia has not identified a single case in which such an exemption was permitted. Indeed, caselaw establishes that CMS likely would have acted arbitrarily and capriciously if it had ignored the applicable regulations. *See, e.g.*, *Aerial Banners, Inc. v. FAA*, 547 F.3d 1257, 1260 (11th Cir. 2008) ("An agency may also act arbitrarily and capriciously by failing to follow its own regulations and procedures.").

## II. CMS HAS AT ALL TIMES COMPLIED WITH THIS COURT'S ORDER IN *GEORGIA I*.

Georgia's assertion that CMS has not complied with this Court's Order in *Georgia I*, Pls.' Opp. at 2-3, 6 n.3, is meritless. As discussed in CMS's opening memorandum, the Court's *Georgia I* Order "set aside" CMS's recission of approval for two components of Pathways. *See Georgia I*, No. 2:22-CV-6, 2022 WL 3581859, at *9 (S.D. Ga., August 19, 2022) ("*Georgia I*"). Consistent with that order, CMS permitted Georgia to fully implement Pathways, and Pathways is currently in effect. At no point since the Court's Order in *Georgia I* has CMS suggested to Georgia that it is considering rescinding the previously approved authorities for Pathways, which by their own terms expire on September 30, 2025. The Court's order in *Georgia I* did not require CMS to extend the demonstration period beyond its existing end date of September 30, 2025. Nor did the Court's order require (or authorize) CMS to ignore the STCs and regulations governing what is required for a state to submit a proper extension request. The issue of Pathways' duration or expiration date was not litigated in *Georgia I* and formed no part of this Court's decision in that case.

The authority Georgia cites does not support its position. Georgia quotes *Forrest General* out of context for its "no take-backs" language, but *Forrest General* is inapposite. *See Forrest Gen. Hosp. v. Azar*, 926 F.3d 221 (5th Cir. 2019); *see* Pls.' Opp. at 6. In *Forrest General*, the Fifth Circuit examined the scope of a Mississippi demonstration project that the Secretary approved in the aftermath of Hurricane Katrina. The question was that project's impact on the counting of Medicaid days in the Medicare Disproportionate Share Hospital ("DSH") payment adjustment. *Forrest Gen.*, 926 F.3d. at 226. The

7

court concluded that, under relevant regulations, uncompensated care days paid for through the § 1115 demonstration project were days for which patients were eligible for inpatient services under the demonstration project. Accordingly, the court held that those patient days were counted in the Medicare DSH payment calculation. *Forrest General* is a Medicare payment dispute that turned on the interpretation of the Medicare statute and regulations. *Id.* at 223.

*Forrest General* and this case overlap in one way only: there was a § 1115 demonstration project involved. But Georgia has nothing else in common with the plaintiff in that case: *Forrest General* was not about the duration of the § 1115 demonstration, and it was not about how the state should go about amending or extending the project under specific, unambiguous STC provisions. The *Forrest General* court reasoned the parties must adhere to the plain language of the demonstration's authorizing documents. In this case, it is Georgia, not CMS, that asks the Court to rewrite those documents, but as *Forrest General* explains, "[j]udges must defer to plain language, not to parties seeking to elude it." *Id.* at 222.

Georgia also relies on *Florida v. United States*, 660 F. Supp. 3d 1239, 1285 (N.D. Fla. 2023), to argue that the effect of the Court's decision setting aside CMS's recission in *Georgia I* was to "re-establish the status quo absent the unlawful agency action." Pls.' Opp. at 2 (citation omitted). The status quo before CMS's rescission was that Pathways was approved through September 30, 2025, and that Georgia had to comply with specified application and notice requirements to extend the project. Thus, the status quo has been reestablished after the Court's decision in *Georgia I*. Georgia suggests the Court's prior decision went further and required CMS to extend the end date of Pathways without a proper extension application. But Georgia points to no language in the decision requiring that result. And, as the case on which Georgia relies makes clear, vacatur of CMS's recission letter "neither compel[led] nor restrain[ed] further agency decision-making." *Florida*, 660 F. Supp. 3d at 1285 (citation omitted).

8

*Georgia I* required CMS to permit Pathways to go into effect with the established end date of September 30, 2025. CMS has done just this, and Georgia does not argue otherwise. *Georgia I* did not require, and could not have required, the novel relief Georgia now seeks.

### III.  THE RELIEF GEORGIA SEEKS IS NOT AUTHORIZED

If, despite CMS's arguments, this Court concludes that the determination under review—that Georgia must apply for an extension in order for CMS to consider that request—is in some way contrary to law or arbitrary and capricious, the only appropriate remedy is to "hold unlawful and set aside" that determination. 5 U.S.C. § 706(2). That order would not, by its own force, extend Pathways beyond September 30, 2025. To run Pathways past that date, Georgia must complete an extension application and CMS would have to approve that application.[1] *See, e.g.*, *PPG Indus., Inc. v. United States*, 52 F.3d 363, 365 (D.C. Cir. 1995) ("[U]nder settled principles of administrative law, when a court reviewing agency action determines that an agency made an error of law, the court's inquiry is at an end: the case must be remanded to the agency for further action consistent with the corrected legal standards.").

In arguing that this Court may fashion relief beyond setting aside the challenged decision and remanding to CMS, Georgia tries, without success, to distinguish between the scope of judicial review and the scope of relief. Pls.' Opp. at 17. The two are inexorably tied. In an APA case such as this one, the district court's role is to "determine . . . whether the agency's decision was . . . flawed." *PPG Indus.*, 52 F.3d at 365 (cleaned up). If it so determines, the only appropriate remedy, "is to remand to the agency for additional investigation or explanation." *Fla. Power & Light Co. v. Lorion*, 470 U.S. 729, 744

---

[1] As CMS explained in its opening memorandum, Georgia can seek judicial review of any decision made by CMS on a proper extension request. *See* Defs.' Mem. at 21-22 (citing 42 C.F.R. § 430.3; 45 C.F.R. Part 16).

9

(1985). This is true regardless of whether the plaintiff argues remand is "inappropriate" or "counterproductive." *See PPG Indus.*, 52 F.3d at 365.

Georgia's citations to the contrary are inapposite, taken out of context, or applied beyond their scope. *Alabama-Tombigbee Rivers Coalition v. Department of Interior*, 26 F.3d 1103, 1107 (11th Cir. 1994), on which Georgia relies, is not an APA case. *See* Pls.' Opp. at 15-16. The "procedural error" corrected there involved the Federal Advisory Committee Act ("FACA"). *See Alabama-Tombigbee,* 26 F.3d at 1106 ("First, we must conduct a de novo review of the district court's authority to grant injunctive relief under FACA as this inquiry involves the interpretation of a statute."). In fact, the court specifically disclaimed any APA holding. *See id.* at 1105, n.7 ("We will only address the question with respect to the purported FACA violation and remedy granted thereunder because we find no merit in the Appellant's arguments involving the Endangered Species Act or the Administrative Procedure Act.").

*Ulstein*, likewise, did not involve the APA. There, the government appealed an adverse judgment, "arguing that the relief granted by the district court is equivalent to an injunction against the [Small Business Administration], and that injunctive relief against that agency is barred by 15 U.S.C. § 634(b)(1)." *Ulstein Mar., LTD. v. United States*, 833 F.2d 1052, 1053 (1st Cir. 1987). And in *Green*, the plaintiffs brought a class action to challenge a state agency's calculation of benefits. *Green v. Mansour*, 474 U.S. 64, 65 (1985). Georgia seems to believe that *Green* was "brought under the APA," Pls.' Opp. at 17, but that is wrong: the APA, of course, has no application to state agencies and it played no role in *Green*.

CMS is obligated to follow the statute and its own regulations governing extension requests. The language of the statute and regulations is mandatory, not permissive. 42 U.S.C. § 1315(d)(2)(A); 42 C.F.R. § 431.408(a). They reflect Congress's determination that transparency is vital when federal sums are spent. For this reason, a court order requiring the agency to ignore these regulations or

exempt Georgia from them would, in effect, require *ultra vires* action. *See Aerial Banners*, 547 F.3d at 1260. Such relief thus is not appropriate.

## CONCLUSION

CMS stands ready to work with Georgia on its extension application. But Georgia is not entitled to an extension of Pathways without such an application. The agency's determination to this effect is reasonable and should be upheld. This Court should enter judgment for CMS.

Dated: June 3, 2024

Respectfully submitted,

BRIAN M. BOYNTON
Principal Deputy Assistant Attorney General

JILL E. STEINBERG
United States Attorney

MICHELLE R. BENNETT
Assistant Branch Director
Civil Division

*/s/ O. Woelke Leithart*
Idaho Bar No. 9257
Assistant United States Attorney
U.S. Attorney's Office
Post Office Box 8970
Savannah, Georgia 31412
Telephone: (912) 652-4422
E-mail: Woelke.Leithart@usdoj.gov

*/s/ Hannah M. Solomon-Strauss*
HANNAH SOLOMON-STRAUSS
Trial Attorney
United States Department of Justice
Civil Division
Federal Programs Branch
1100 L Street N.W.
Washington, D.C. 20005
202-616-8198
hannah.m.solomon-strauss@usdoj.gov

*Attorneys for Defendants*

## CERTIFICATE OF SERVICE

I certify that this motion was electronically filed with the Clerk of Court, using the CM/ECF system, on June 3, 2024, thereby serving all counsel of record.

*/s/ Hannah M. Solomon-Strauss*
HANNAH M. SOLOMON-STRAUSS
*Counsel for the Defendants*