# In the United States District Court
# for the Southern District of Georgia
# Brunswick Division

THE STATE OF GEORGIA, and
GEORGIA DEPARTMENT
OF COMMUNITY HEALTH,

    Plaintiffs,

    v.

CHIQUITA BROOKS-LASURE, in her
official capacity as
Administrator of the Centers
for Medicare and Medicaid
Services, et al.,

    Defendants.

2:24-CV-16

## ORDER

Before the Court is Plaintiffs State of Georgia and Georgia Department of Community Health's (collectively, "Georgia") motion for summary judgment, dkt. no. 19, as well as the federal government Defendants' motion for summary judgment, dkt. no. 21. The motions have been thoroughly briefed and are ripe for review. Dkt. Nos. 19, 21, 22, 23, 25. The Court heard oral argument on June 21, 2024. Dkt. No. 27. For the reasons stated below, Plaintiffs' motion is **DENIED**, and Defendants' motion is **GRANTED**.

## BACKGROUND

This case is about whether the Centers for Medicare and Medicaid Services ("CMS") violated the Administrative Procedure

Act ("APA") when it denied Georgia's request to prolong the implementation period for the Georgia Pathways to Coverage program. Because Georgia's request did not comply with the rules governing extensions of the program, the Court finds that CMS did not violate the APA.

This case is the second round of litigation in federal court over the Georgia Pathways to Coverage Medicaid expansion program. For a full recitation of the facts of this case, refer to the Court's previous order. Georgia v. Brooks-LaSure, No. 2:22-CV-6, 2022 WL 3581859 (S.D. Ga. Aug. 19, 2022). A condensed version of the first case is as follows: Georgia created the Pathways program as a Medicaid demonstration project that expands Medicaid coverage to Georgians who do not qualify for traditional Medicaid.[1] Id. at *3. Coverage under Georgia Pathways is conditional, meaning that applicants must satisfy certain eligibility requirements. Id. The rules governing the program are set forth in an agreement between Georgia and CMS (the "Agreement"). Dkt. No. 19-3. After the parties entered into the Agreement and CMS approved Georgia Pathways, CMS did an about-face and withdrew its approval. 2022 WL 3581859, at *6. Georgia sued. Id. Georgia won. Id. The Court found that CMS's rescission violated the APA because "it was arbitrary and

---

[1] A Medicaid demonstration project is a waiver from the requirements of the Social Security Act. See 42 U.S.C. § 1315. Demonstration projects are governed by 42 U.S.C. § 1315 and federal regulations promulgated by CMS, 42 C.F.R. § 400 et seq.

capricious on numerous, independent grounds." Id. at *23. As a result, the Court vacated CMS's rescission of Georgia Pathways. Id.

Georgia renewed its effort to implement the Pathways program. Due to delays caused by the first round of litigation, however, Georgia had to reassemble major components of the program. Dkt. Nos. 19-15, 19-16. By November 2022, Georgia had completed this work and planned for the program to go into effect in the summer of 2023. Dkt. No. 19-16.

On February 24, 2023, Georgia asked CMS to "amend the effective dates" of the program. Dkt. No. 19-23 at 2. More specifically, Georgia asked CMS to revise the program's end date to September 30, 2028. Id. Pursuant to the Agreement, the implementation period for Georgia Pathways is October 15, 2020, to September 30, 2025. Dkt. No. 19-3 at 2. Georgia explained in its 2023 letter that extending the end date to 2028 would "provide the state with a full five-year period in which to operate, monitor, evaluate, and assess the effectiveness of the Pathways to Coverage 1115 Demonstration." Id. at 2. Georgia further explained that "[b]ased on the limited time remaining in the Demonstration and [the] implementation date of July 1, 2023," Georgia would "have limited time in which to evaluate and assess the effectiveness of the demonstration waiver prior to its expiration." Id. Georgia told CMS that submitting a formal extension request would be

3

premature because Georgia "would have just collected its baseline data and would not have had an opportunity to conduct any comparisons or perform its evaluation activities." Id. at 6.

On October 5, 2023, CMS denied Georgia's request to amend the end date to 2028. Dkt. No. 19-29. This was because CMS found that Georgia had failed to comply with the requirements necessary for CMS to grant an extension. Id. The Agreement contemplates two ways to change the Pathways program: amendments and extensions. Dkt. No. 19-3. "Changes related to eligibility, enrollment, benefits, beneficiary rights, delivery systems, cost sharing, sources of non-federal share of funding, budget neutrality, and other comparable program elements must be submitted to CMS as amendments to the demonstration." Id. at 6. Amendment requests are subject to approval at the discretion of the Department of Health and Human Services Secretary. Id. On the other hand, extensions govern changes to the temporal length of the program. Id. at 7. To obtain an extension, the state must "submit an application to CMS from the Governor or Chief Executive Officer of the state in accordance with the requirements of 42 Code of Federal Regulations (CFR) 431.412(c)." Id.

42 C.F.R. § 431.412(c) requires that states seeking to extend the duration of a demonstration project submit a formal extension request. Id. "A request to extend an existing demonstration . . . will be considered only if it is submitted at least 12 months . . .

4

or 6 months prior to the expiration date of the demonstration."

Id. "An application to extend an existing demonstration will be considered complete" when a state provides the following:

> (i) A historical narrative summary of the demonstration project, which includes the objectives set forth at the time the demonstration was approved, evidence of how these objectives have or have not been met, and the future goals of the program.

> (ii) If changes are requested, a narrative of the changes being requested along with the objective of the change and the desired outcomes.

> (iii) A list and programmatic description of the waivers and expenditure authorities that are being requested for the extension period, or a statement that the State is requesting the same waiver and expenditure authorities as those approved in the current demonstration.

> (iv) Summaries of External Quality Review Organization (EQRO) reports, managed care organization (MCO) and State quality assurance monitoring, and any other documentation of the quality of and access to care provided under the demonstration, such as the CMS Form 416 EPSDT/CHIP report.

> (v) Financial data demonstrating the State's historical and projected expenditures for the requested period of the extension, as well as cumulatively over the lifetime of the demonstration. This includes a financial analysis of changes to the demonstration requested by the State.

> (vi) An evaluation report of the demonstration, inclusive of evaluation activities and findings to date, plans for evaluation activities during the extension period, and if changes are requested, identification of research hypotheses related to the changes and an evaluation design for addressing the proposed revisions.

> (vii) Documentation of the State's compliance with the public notice process set forth in § 431.408 of this subpart, including the post-award public input process described in § 431.420(c) of this subpart, with a report of the issues raised by the public during the comment

period and how the State considered the comments when
developing the demonstration extension application.

42 C.F.R. §§ 431.412(c)(2)(i)-(vii).

CMS determined that Georgia did not submit a proper request
for an amendment or extension. Dkt. No. 19-29. As the agency
explained: "[Georgia's] request does not qualify as an
'amendment,' but rather would be considered a request for an
extension of the demonstration, because it does not request to
change the program elements referenced in [the Agreement]." Id. at
2. "Extending the demonstration period is not among the changes
listed . . . that can be made through an amendment, and, consistent
with CMS practice, a change to a demonstration's effective dates
is properly considered an extension." Id. Nor, according to CMS,
can Georgia's submission be construed as a proper request for an
extension. Id. CMS concluded that "[a]s submitted, the February
24th letter does not meet the minimum requirements for CMS to
consider an extension request" under 42 C.F.R. § 431.412(c). Id.
It lacked the necessary supporting material. Id. Finally, CMS told
Georgia: "Should the state choose to seek an extension of the
Pathways demonstration, CMS will review the request in accordance
with these requirements. Absent meeting these requirements, CMS is
unable to consider a formal request for extension." Id.

On November 16, 2023, Georgia asked CMS to reconsider its denial. Dkt. No. 19-30. Georgia explained that its February 24, 2023 request

> was not a request for an "extension" in the classic sense of allowing a demonstration project to last longer than its initially authorized term. Instead, the sole purpose of [the] request was to ensure Georgia was able to implement its program for the originally authorized five-year term notwithstanding the lengthy delay caused by CMS's unlawful rescission of key program terms and the subsequent need for litigation.

Id. at 2. Georgia acknowledged that the Agreement

> enumerates specific changes that would be considered amendments. However, this list is not exhaustive as this section also contains a catch all phrase which allows for amendments to "other comparable program elements." [Georgia] interprets this broadly to include other program elements such as the effective dates of the demonstration. Moreover, there is no language . . . which expressly prohibits CMS from amending the demonstration and extending the end date to make the State whole for delays solely attributable to CMS' unlawful actions.

Id. at 4. Georgia also emphasized that the program had not had time to gather sufficient data to submit an extension request. Id. at 6. Moreover, Georgia argued that "because Pathways is an expansion of coverage to individuals not otherwise eligible, any attempt by CMS to limit or curtail the program would 'result in less Medicaid coverage for Georgians.'" Id. at 7 (quoting Brooks-LaSure, 2022 WL 3581859, at *20).

On December 22, 2023, CMS affirmed its denial. Dkt. No. 19-31. CMS reiterated:

> States have the option to formally request an extension

of a demonstration beyond the approved end date. CMS
must consider Georgia's request to extend the Pathways
demonstration approval period consistent with how we
approach all state requests for demonstration
extensions, which is uniform notwithstanding any
implementation delays the requesting state may have
experienced with respect to a particular demonstration.
As CMS stated in our October 5, 2023 letter, Georgia
must submit an extension request that complies with 42
CFR 431.412(c) for CMS to be able to consider extending
the demonstration approval period.

Id. at 2-3. "Adding three years to the demonstration approval

period is an extension of the demonstration, and thus must comply

with section 1115 demonstration transparency requirements under 42

CFR 431.412(c)." Id. at 3. CMS reaffirmed its decision that

Georgia's February 24, 2023 request did not meet 42 C.F.R.

§ 431.412(c)'s extension request requirements. Id.

Georgia then filed the present lawsuit pursuant to Section

706 of the APA. Dkt. No. 1. Georgia alleges that CMS's denial

decision was arbitrary and capricious, violated the Agreement, and

violated the Social Security Act. Id.

<strong>LEGAL AUTHORITY</strong>

**I. Summary Judgment**

The Court should grant summary judgment if "there is no

genuine dispute as to any material fact and the movant is entitled

to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party

seeking summary judgment "bears the initial responsibility of

informing the district court of the basis for its motion, and

identifying those portions of the pleadings, depositions, answers

to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." Celotex Corp. v. Catrett, 477 U.S. 317, 323 (1986) (internal quotation marks omitted).

Facts are "material" if they could affect the outcome of the suit under the governing substantive law. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 248 (1986). A dispute of those material facts "is 'genuine' . . . if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." Id. "The mere existence of a scintilla of evidence in support of the [nonmovant's] position will be insufficient" for a jury to return a verdict for the nonmoving party. Id. at 252. Additionally, the party opposing summary judgment "may not rest upon the mere allegations or denials in [her] pleadings. Rather, [her] responses . . . must set forth specific facts showing that there is a genuine issue for trial." Walker v. Darby, 911 F.2d 1573, 1576-77 (11th Cir. 1990).

The Court views the record evidence "in the light most favorable to the [nonmovant]," Matsushita Electric Industrial Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986), and will draw all justifiable inferences in the nonmovant's favor, Anderson, 477 U.S. at 255.

## II.   Cross Motions for Summary Judgment

The filing of cross motions for summary judgment does not change the Rule 56 standard. See 3D Medical Imaging Sys., LLC v. Visage Imaging, Inc., 228 F. Supp. 3d 1331, 1336 (N.D. Ga. 2017); Westport Ins. Corp. v. VN Hotel Grp., LLC, 761 F. Supp. 2d 1337, 1341 (M.D. Fla. 2010) (citing Latin Am. Music Co. v. Archdiocese of San Juan of the Roman Catholic & Apostolic Church, 499 F.3d 32, 38 (1st Cir. 2007)). The same standard applies to cross motions for summary judgment just as if only one party had moved for summary judgment and "simply requires a determination of whether either of the parties deserves judgment as a matter of law on the facts that are not disputed." Yager v. Lockheed Martin Corp., No. 1:14-CV-1548, 2016 WL 319858, at *3 (N.D. Ga. Jan. 26, 2016). "Cross-motions must be considered separately, as each movant bears the burden of establishing that no genuine issue of material fact exists and that it is entitled to judgment as a matter of law." Shaw Constructors v. ICF Kaiser Eng'rs, Inc., 395 F.3d 533, 538–39 (5th Cir. 2004).

### DISCUSSION

## I.   An Overview of Section 706 of the Administrative Procedure Act

The APA provides that "[a] person suffering legal wrong because of agency action, or adversely affected or aggrieved by agency action within the meaning of a relevant statute, is entitled to judicial review thereof." 5 U.S.C. § 702. To be reviewable,

however, the agency action must be "final." 5 U.S.C. § 704. The test for finality involves two steps: (1) "the action must mark the consummation of the agency's decisionmaking process—it must not be of a merely tentative or interlocutory nature"; and (2) "the action must be one by which rights or obligations have been determined, or from which legal consequences will flow." Bennett v. Spear, 520 U.S. 154, 178 (1997) (internal quotation marks and citations omitted); see also Florida v. U.S. Army Corps of Eng'rs (In re MDL-1824 Tri-State Water Rights Litig.), 644 F.3d 1160, 1181 (11th Cir. 2011).

If the agency action is final, Section 706 of the APA speaks to the relief that an aggrieved party may seek. Mila Sohoni, *The Power to Vacate a Rule*, 88 GEO. WASH. L. REV. 1121, 1162 (2020). Section 706 says that "[t]he reviewing court shall—(1) compel agency action unlawfully withheld or unreasonably delayed; and (2) hold unlawful and set aside agency action, findings, and conclusions" the reviewing court finds to be "(A) arbitrary, capricious, an abuse of discretion, or otherwise not in accordance with law; (B) contrary to constitutional right, power, privilege, or immunity; (C) in excess of statutory jurisdiction, authority, or limitations, or short of statutory right; [or] (D) without observance of procedure required by law." 5 U.S.C. § 706.

"To determine whether an agency decision was arbitrary and capricious, the reviewing court must consider whether the decision

11

was based on a consideration of the relevant factors and whether there has been a clear error of judgment." Fund for Animals, Inc. v. Rice, 85 F.3d 535, 541 (11th Cir. 1996) (internal quotation marks omitted). "The arbitrary and capricious standard is 'exceedingly deferential.'" Defenders of Wildlife v. U.S. Dep't of Navy, 733 F.3d 1106, 1115 (11th Cir. 2013) (citation omitted). As a result, "a party seeking to have a court declare an agency action to be arbitrary and capricious carries a heavy burden indeed." Legal Env't Assistance Found. v. E.P.A., 276 F.3d 1253, 1265 (11th Cir. 2001) (internal quotation marks and citation omitted). However, an agency's decision may be arbitrary and capricious

> where the agency has relied on factors which Congress has not intended it to consider, entirely failed to consider an important aspect of the problem, offered an explanation for its decision that runs counter to the evidence before the agency, or is so implausible that it could not be ascribed to a difference in view or the product of agency expertise.

Defenders of Wildlife, 733 F.3d at 1115 (citation omitted).

The Court cannot substitute its judgment for the agency's if the agency's conclusions are rational. Id. (citing Miccosukee Tribe of Indians of Fla. v. United States, 566 F.3d 1257, 1264 (11th Cir. 2009)); see also Sierra Club v. Flowers, 526 F.3d 1353, 1360 (11th Cir. 2008) ("The court's role is to ensure that the agency came to a rational conclusion." (citation omitted)); Pres. Endangered Areas of Cobb's History, Inc. v. U.S. Army Corps of Eng'rs, 87 F.3d 1242, 1246 (11th Cir. 1996) ("The role of the court

is not to conduct its own investigation and substitute its own judgment for the administrative agency's decision." (citation omitted)).

To this extent, it is important to note the recent changes brought to the field of administrative law by the Supreme Court's decision in Loper Bright Enterprises v. Raimondo, 603 U.S. ____ (2024). In Loper, the Supreme Court overruled Chevron U.S.A. Inc. v. Natural Resources Defense Council, Inc., 467 U.S. 837 (1984). 603 U.S., slip op. at 35. In the post-Chevron world, courts "must exercise their independent judgment" to determine whether an agency's interpretation of the statute it administers comports with the agency's statutory authority. Id. "[C]ourts need not and under the APA may not defer to an agency interpretation of the law simply because a statute is ambiguous." Id. However, the Court also explained that Section 706 of the APA "does mandate that judicial review of agency policymaking and factfinding be deferential." Id. at 14 (citing 5 U.S.C. § 706(2)(A), 706(2)(E)).

Understanding this background, the questions now before the Court are: (1) was CMS's denial of Georgia's request a final agency action, and (2) if it was, did CMS's decision violate the APA? The Court finds that the answer to the first question is "yes" and the answer to the second is "no."

**II.  CMS's Denial Was a Final Agency Action.**

The parties agree that CMS's denial constitutes a final agency action.[2] See Dkt. No. 19 at 16–17. Regardless, CMS's denial decision meets both finality requirements.

First, CMS's denial decision is neither tentative nor interlocutory. See Bennett, 520 U.S. at 178. CMS did not send Georgia a draft letter or a proposal. Rather, the agency announced a final decision that binds Georgia. CMS's December 22, 2023 letter affirming its denial explicitly stated that "the state's request does not qualify as an amendment" and "CMS is unable to consider the state's request for extension" because the request did not meet the requirements of 42 C.F.R. § 431.412(c). Dkt. No. 19-31. In other words, CMS definitively denied Georgia's February 2023 request to extend the program's end date to 2028.

Second, CMS's denial decision determines rights and has legal consequences. See Bennett, 520 U.S. at 178. CMS's denial determined Georgia's rights under the Agreement. The agency interpreted the Agreement and federal regulations to require Georgia to submit a formal extension request that satisfies 42 C.F.R. § 431.412(c). Legal and practical consequences flow from this decision as Georgia will have to terminate the Pathways program in 2025 or file an

---

[2] Although Defendants' briefs did not specify whether CMS's denial was a final agency action, they admitted it was a final agency action during oral argument before the Court.

extension request with the requisite information. Pursuing either option will require the state to expend money, resources, and time.

Final agency action permitting judicial review exists here. The Court now turns to whether CMS's denial decision violated the APA.

III.   **CMS's Decision Did Not Violate the APA.**

A. **To Extend the Duration of the Georgia Pathways Program, Georgia Was Required to Submit an Extension Request.**

Georgia faults CMS for treating the state's request as an extension request, but an extension request it was. Under the terms of the Agreement and 42 C.F.R. § 431.412(c), an extension request is the only option through which Georgia and CMS can extend the program's end date to 2028.

Georgia's February 2023 letter may well have been dressed up as an amendment. The state did not request a change "related to eligibility, enrollment, benefits, beneficiary rights, delivery systems, cost sharing, sources of non-federal share of funding, [or] budget neutrality." Dkt. No. 19-3 at 6. Contrary to Georgia's argument, the request did not "[fall] comfortably within [the Agreement's] catchall clause covering amendments to 'other comparable program elements.'" Dkt. No. 19 at 14 (citation omitted). Georgia's "request to extend the end date of the demonstration to September 30, 2028" was not a comparable program element to eligibility, enrollment, benefits, beneficiary rights,

delivery systems, cost sharing, funding, or budget neutrality. Dkt. No. 19-23 at 6. Georgia's "request to extend the end date" must be treated as a request to extend the end date, that is, an extension request.

The requirement that Georgia seek an extension request to extend the duration of Pathways is not just imposed by the Agreement, but also federal regulations. See 42. C.F.R. § 431.412. Pursuant to 42. C.F.R. § 431.412(c), "[a] request to extend an existing demonstration" must be submitted as an extension request. Looking to the Agreement and the regulations leads to the same conclusion: to extend the end date of Georgia Pathways to 2028, Georgia was required to submit—an extension request.

Georgia's argument that its February 2023 letter is an amendment request because it seeks to revise the Agreement to reflect the five-year implementation period as originally bargained is well-taken. Dkt. No. 24 at 4-6. After all, the main reason for the delay in implementing Georgia Pathways was CMS's unlawful rescission of the program. CMS's prior bad act, however, does not allow Georgia to now skirt the rules and regulations governing time extensions. The rules of the Agreement and requirements of 42 C.F.R. § 431.412(c) remain in full force and were unaltered by Georgia's first case against CMS. No matter the delay caused by CMS's unlawful rescission, any request by Georgia to extend the end date of Georgia Pathways beyond September 30,

16

2025, must be done through a formal extension request. CMS was, therefore, correct to treat Georgia's February 2023 letter as an extension request and not an amendment request.

**B. Georgia Did Not Submit a Proper Extension Request.**

Georgia conceded at oral argument that its February 2023 letter did not comply with 42. C.F.R. § 431.412(c)'s requirements for an extension request. It is also clear from the letter itself that Georgia was not submitting an acceptable extension request. Dkt. No. 19-23. The letter does not contain the data and information required for an extension request under 42 C.F.R. § 431.412(c)(2). Id. Given this and Georgia's concession, there is no dispute that the state failed to submit a proper extension request.

**C. CMS Properly Denied Georgia's Request.**

To extend the end date of Georgia Pathways, Georgia needed to submit an extension request that satisfied 42 C.F.R. § 431.412(c)'s requirements. It did not. CMS, therefore, did not violate the APA when it denied Georgia's request. This conclusion is the same, Chevron or not.

An agency's interpretation of its own regulation is controlling if it is not "plainly erroneous or inconsistent with

the regulation."[3] <u>Robertson v. Methow Valley Citizens Council</u>, 490 U.S. 332, 359 (1989) ("This interpretation of the agency's own regulation is not 'plainly erroneous or inconsistent with the regulation,' and is thus controlling." (quoting <u>Bowles v. Seminole Rock & Sand Co.</u>, 325 U.S. 410, 414 (1945))); <u>see also</u> <u>Auer v. Robbins</u>, 519 U.S. 452, 461 (1997). An agency does not act arbitrarily and capriciously by following its own regulations and procedures. <u>Aerial Banners, Inc. v. FAA</u>, 547 F.3d 1257, 1261 (11th Cir. 2008); <u>see also</u> <u>Simmons v. Block</u>, 782 F.2d 1545, 1550 (11th Cir. 1986) ("The failure of an agency to comply with its own regulations constitutes arbitrary and capricious conduct. The courts must overturn agency actions which do not scrupulously follow the regulations and procedures promulgated by the agency itself." (citations omitted)); <u>Visat, Inc. v. FCC</u>, 47 F.4th 769, 776 (D.C. Cir. 2022) ("[A]n agency abuses its discretion when it arbitrarily violates its own rules, not when it follows them." (internal quotation marks and citations omitted)).

That standard is easily met here. 42 C.F.R. § 431.412(c) governs extension requests and establishes the procedures a state must follow to receive an extension. CMS interpreted this regulation to mean that any request from Georgia to extend the

---

[3] This doctrine remains intact following the reversal of <u>Chevron</u>. <u>Loper</u> dealt with an agency's interpretation of a statute, not its own regulation. <u>See</u> 603 U.S. ____.

Pathways program must comply with 42 C.F.R. § 431.412(c)'s requirements. CMS then followed 42 C.F.R. § 431.412 when it denied Georgia's request because it did not include the requisite materials.

Georgia's arguments that CMS's denial was, nevertheless, arbitrary and capricious are unavailing. Contrary to Georgia's claim, the denial did not "run[] counter to the evidence before the agency." Dkt. No. 19 at 18. At the time of the denial, the evidence before the agency showed that Georgia submitted a request to extend the Pathways program that failed to satisfy the requirements for an extension request. To this end, CMS's denial did not "fail[] to offer any reasoned basis for requiring Georgia to notice, compile, and submit a formal extension request." Id. at 19. CMS told Georgia that "if the state intend[ed] to request an extension of the demonstration, its application must comply with 42 CFR 431.412(c) . . . . The state's submitted request to extend the demonstration does not meet the requirements of . . . 42 CFR 431.412(c)." Dkt. No. 19-29 at 2. This is not "the definition of arbitrary reasoning," as Georgia contends. Dkt. No. 19 at 19. Quite the opposite, in fact. CMS denied Georgia's extension request because Georgia did not follow the rules for submitting an extension request. CMS explained this to Georgia and walked the state through the requirements. Dkt. Nos. 19-29, 19-31. Such actions do not meet the arbitrary and capricious standard, see

Defenders of Wildlife, 733 F.3d at 1115, nor would they run afoul of the Court's independent judgment.

Georgia also argues that CMS "failed to consider the fact that without a revised end date, Georgia is faced with a choice between two highly desirable options: either prepare a pointless and costly extension request or submit a plan to terminate Pathways even though the program has barely begun." Dkt. No. 19 at 20. Georgia's straw man argument fails here because the state has offered no evidence that a formal extension request would be pointless. CMS told Georgia that it would consider granting an extension request that satisfied 42 C.F.R. § 431.412(c). See Dkt. Nos. 19-29, 19-31. CMS even told Georgia:

> The state has plenty of time before the expiration of the currently approved demonstration authorities to meet the regulatory requirements to request an extension, if it intends to do so. Should the state choose to seek an extension of the Pathways demonstration, CMS will work with the state to meet these requirements and review the request in accordance with federal rules.

Dkt. No. 19-31 at 4. No evidence suggests that CMS would deny an extension request from Georgia that satisfies 42 C.F.R. § 431.412(c). While preparing a proper extension request may be costly and burdensome, CMS cannot bend the rules.

Next, Georgia argues that CMS "contradicted its earlier policy, memorialized in the [Agreement], that Pathways warranted a five-year demonstration project." Dkt. No. 19 at 21. Although the Agreement contains one mention that the program will run for

a "five-year period," even this mention defines the end date as September 30, 2025. See Dkt. No. 19-3 at 4 ("The Georgia Pathways to Coverage demonstration will operate statewide and is approved for a 5-year period from October 15, 2020 - September 30, 2025."). CMS did not contradict its earlier policy by enforcing the September 30, 2025 end date. Georgia and CMS agreed that the Pathways program would operate from October 15, 2020 to September 30, 2025. Id. Georgia argues that CMS superseded its statutory authority by following this end date, "unilaterally shorten[ing] an already-approved demonstration." Dkt. No. 19 at 23. However, CMS could not unilaterally change the Agreement to include a September 30, 2028 end date absent a formal, satisfactory extension request from Georgia. See 42 C.F.R. § 431.412(c). And to deny Georgia's deficient extension request was well within CMS's statutory authority under the Social Security Act. See 42 U.S.C. § 1315(f) (empowering CMS to approve or disapprove extension requests).

This same point also applies to Georgia's argument that CMS "ignored Georgia's massive and reasonable reliance interests." Dkt. No. 19 at 21. When an agency adopts a new policy and "its prior policy has engendered serious reliance interests," the agency must consider those reliance interests. FCC v. Fox Television Stations, Inc., 556 U.S. 502, 515 (2009). CMS, however, did not adopt a new policy. Extending the program's end date to

2028 would constitute a new policy. Abiding by the current 2025 end date does not. "An agency may not . . . simply disregard rules that are still on the books." Id. (citation omitted). Here, the rules on the books hold that CMS can extend a Medicaid demonstration project only if the state submits an extension request in compliance with 42 C.F.R. § 431.412(c). Georgia failed to do so. CMS, therefore, did not adopt a new policy that required consideration of reliance interests by denying Georgia's request.

Finally, Georgia argues that CMS "provide[d] no reasoned basis for requiring that Georgia submit the project's original planned duration period to redundant and burdensome rounds of public notice and comment." Dkt. No. 19 at 22. But this is what 42 C.F.R. § 431.408 requires. "A State must provide at least a 30-day public notice and comment period regarding applications for . . . an extension of an existing demonstration project that the State intends to submit to CMS for review and consideration." 42 C.F.R. § 431.408(a). Again, CMS cannot "simply disregard rules that are still on the books." Fox Television Stations, 556 U.S. at 515. Those rules required CMS to consider only extension requests that undergo a public notice and comment process.

Ultimately, CMS's decision was consistent with the Social Security Act, federal regulations, and the Agreement. Providing health care coverage to needy individuals is the core purpose of Medicaid. Harris v. McRae, 448 U.S. 297, 301 (1980). Even though

22

Georgia Pathways serves this policy goal, that alone does not absolve Georgia from its responsibility to follow the rules governing extensions of Medicaid demonstration programs. <u>See</u> 42 U.S.C. § 431.412(c). Pursuant to the Agreement and federal regulations, if Georgia wants to extend the program beyond the September 30, 2025 deadline, it has to follow the rules for obtaining an extension.

<strong>CONCLUSION</strong>

For these reasons, Plaintiffs' motion for summary judgment, dkt. no. 19, is **DENIED**, and Defendants' motion for summary judgment, dkt. no. 21, is **GRANTED**. The Clerk is **DIRECTED** to close this case.

**SO ORDERED** this 15th day of July, 2024.

_____
HON. LISA GODBEY WOOD, JUDGE
UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF GEORGIA